HIGGINS ET AL. V. ARMSTRONG.

1. The principal is bound by all acts of the agent within the scope of the authority, as held out to the world by the principal, although more limited private instructions have been given which are unknown to persons dealing with him.

2. That an agency may be proved by the habit and course of dealing between the parties is clear upon principle and authority.

3. A mining partnership exists where the several owners of a mine co-operate in the working of the mine.   Such partnership is governed by many of the rules relating to ordinary partnerships, but differing therefrom in many important particulars.

4. Where a member of a mining partnership purchases articles necessary to the carrying on of the business, the debt being contracted in the usual course of business, and within the scope of the part-

nership venture, the individual member having authority to con-
tract the debt, the copartners will be bound thereby.

5. Notice of facts to an agent is constructive notice to the principal
   himself when it arises from, or is at the time connected with, the
   subject-matter of the agency.

6. The rule that unless the ratification by the principal of the acts,
   doings or omissions of his agent be made with full knowledge of
   all the circumstances of the case, it will not be obligatory upon
   him, whether the principal's want of knowledge arises from the
   design, concealment or misrepresentation of the agent or from his
   own innocent inadvertence, *held* not applicable to executory con-
   tracts involving the features of this case.

7. Long continued silence gives rise to a presumption of ratification.

8. Objections to questions should specify the grounds of objection at
   the proper time; it is too late to make specific objections in this
   court.

9. Unless the tender of a sum admitted to be due be unconditional,
   interest may be recovered thereon.

*Appeal from District Court of Lake County.*

THE facts are stated in the opinion.

Messrs. MARKHAM, PATTERSON and THOMAS, for appel-
lants.

Mr. L. C. ROCKWELL, for appellee.

BECK, C. J.    This is an action brought by the appellee,
Armstrong, against the appellants, Higgins and others,
composing a partnership or association of persons styled
"The American Smelting Company," to recover damages
for the alleged violation by said company of a contract
to receive and pay for seventy-five thousand bushels of
charcoal.    The complaint alleges that the contract was
entered into and executed on the part of the company
by its agent, T. W. Robinson, who had authority to make
and execute the same.    It bears date March 24, 1879, and
provides that Armstrong shall deliver to said company,
at their smelting works in the city of Leadville, seventy-
five thousand bushels of well-burned charcoal, at the
price of seventeen cents per bushel, ten per cent. of the

contract price to be retained by the company until the completion of the contract. The coal was to be delivered in such manner that there should be not less than five hundred bushels on the grounds of the company at any time. The works were not completed until early in June, but the delivery of the coal was commenced on the 2d day of May, and continued until the 24th day of June, when Caleb B. Wick, who had been appointed the general manager of the defendants, refused to receive any more coal upon the contract, basing his refusal upon the ground that the coal being delivered was of inferior quality. The defendants, in their answer, denied all the allegations of the complaint, but their main ground of defense was that Robinson was not authorized to execute the contract for the company.

The principal legal questions involved in the case are raised by the eleventh assignment of errors, which calls in question the correctness of the third instruction given on the part of the appellee, Armstrong. In addition to this question, and connected with it, are two vital questions arising upon the record, viz.: Was this contract within the scope of Robinson's agency? If not, was it afterwards properly ratified or adopted as the act of the company?

Robinson was a metallurgist, and had experience in the construction and operation of smelting works. His original employment by the defendants was to erect smelting works for the company, and thereafter to remain as superintendent of the mixing and assaying of ores. Upon his arrival in Leadville, early in February, 1879, he brought two letters from H. I. Higgins, a member of the company, whose authority in the premises is conceded on both sides,— one addressed to J. J. Safely, the other to the Bank of Leadville. These letters are as follows:

Letter to J. J. Safely, dated February 10, 1879:

"Mr. Robinson leaves this morning for Leadville with

several men to put up building and machinery for smelters. Mr. Robinson will have charge of the erection of all buildings and machinery.. We want you to be on the lookout constantly for our outside interests, and when you come across a good thing let us know. Do not buy any lots or other property without consulting us.

"JOHN V. AYERS' SONS.

" H. I. HIGGINS, Trustee."

Letter to the Bank of Leadville:

" FEBRUARY 10, 1879.

"This will serve to introduce to you Mr. T. W. Robinson, who goes to Leadville in our interests to erect smelting works. Any drafts of Mr. Robinson on us for money to pay freight on machinery, etc., for material and labor in erecting works, will be paid by us, and we shall be glad to have you honor the same.

" JOHN V. AYERS' SONS.

"H. I. HIGGINS, Trustee."

In addition to these letters the defendants Higgins, Otis and Wick testified that Robinson had no authority other than is expressed in the letters. Robinson being deceased, the parties were deprived of the benefit of his testimony upon the subject of his authority to make the contract in question.

The testimony shows that the company had mining interests at Leadville at and before the time of the arrival of Mr. Robinson, and that up to the time of his arrival it had an agent there in the person of Mr. Safely. Safely does not appear to have remained there after this date. Robinson appears to have been the only agent representing the company at that place from about February 15th to April 15th succeeding, when the defendant Caleb B. Wick was sent out by the company to take general management and control of all the company's property and business in and about Leadville. A review of the whole testimony affords ground for grave doubts whether the company's letters to Safely and the Bank of Leadville set

forth the full scope of Robinson's powers. His power to contract, in the name of the company, for lumber, stone, iron and other materials necessary in the erection of the works, and to hire men and pay freight, is not questioned. But defendants say this was the extent of his authority. The plaintiff's testimony shows that Robinson looked after the company's mining interests during the time of his sole agency, and paid men for prospecting and developing the same. Higgins mentions the fact that the company had mining interests at Leadville. The witness Sanderson says Robinson was paying for prospecting and developing mines, and building the smelting works. The plaintiff, Armstrong, says, when he first became acquainted with defendants they were erecting a smelter and engaged in a mining enterprise. He says he received money from the company through Sanderson, which was paid by Robinson, for work performed on the company's mines.

It is substantially conceded that Robinson's agency was not a special one, limited to the supervision of the work of erecting smelting works, nor ending with the completion of the buildings and machinery. His employment was a continuing one. On completion of the smelter he was to take charge of and superintend an important department of the work of smelting ores, which position he in fact filled for several months, as appears from the testimony of Mr. Higgins. The contract made by Robinson with the plaintiff for the delivery of the charcoal, as before stated, bears date March 24, 1879. This was while Robinson was the sole agent of the defendants at Leadville, and while he was looking after all their interests, according to the testimony referred to. It does not appear that any act of Robinson was disavowed, and it is probable that the charcoal contract would have fared the same as the mining transactions had not the price of charcoal greatly declined before the entire amount specified had been delivered. It is clear that if Robinson

looked after and expended money for the business interests of the company outside the smelting works and expenses of their erection, either by direction of the company, or by its permission or silence, knowing that he was performing such acts, the company would be properly held liable upon the contract for charcoal. The powers alleged to have been exercised by Robinson, if performed with either the express or implied knowledge of the company, cast upon it the responsibility of holding him out to the world as a general agent respecting the class of business in which the company was engaged. The rule in such case is that third persons, ignorant of the extent of the agent's authority, will be protected. It was a question for the jury, under proper instructions as to the law, whether or not Robinson was held out as a general agent in respect to the building of the smelter, and the procuring of the supplies to be used in running the same.

Developing mines in the vicinity might well be taken to indicate a design to use ore therefrom in operating the works. A supply of charcoal was just as essential to the operation of the works, under the process adopted, as mineral; for, by this process, charcoal was to be mixed, in certain proportions, with the ores to be smelted. If the facts are as claimed by the plaintiff, the case comes within the principle announced in *Jacobson v. Poindexter*, 42 Ark. 97, that the principal is bound by all acts of the agent within the scope of the authority, as held out to the world by the principal, although more limited private instructions have been given, which are unknown to persons dealing with him. See, to same effect, Whart. Ag. & Ag. § 126. The first coal received for the company under this contract was on the 2d day of May, 1879, and that was received by the general manager, Caleb B. Wick. We have the testimony of Mr. Higgins that Mr. Wick was, at this time, an owner in the company. Mr. Higgins says: "Mr. C. B. Wick, being an

owner in our concern, went out to take general charge." Wick continued to receive coal upon the contract, paying therefor according to the terms and conditions specified therein, until the 24th day of June, when he refused to receive any more for the reason above stated. Upon the 14th day of June he addressed to Higgins a letter on the subject, of which the following is a copy:

"LEADVILLE, June 14, 1879.

"*H. I. Higgins, Esq., Trustee* — DEAR SIR: Mr. Robinson contracted for charcoal,— one hundred and thirty-five thousand bushels at seventeen cents per bushel. One party has a written contract to furnish seventy-five thousand. He was not responsible, and it was too much of a one-sided contract. I am buying charcoal at from eight to ten cents per bushel, making a difference in our contract of some $6,000. Mr. Otis informed me that Mr. Robinson had no authority to make such contracts.

"Yours truly, CALEB B. WICK."

Mr. Higgins answered promptly, and declared that the company would not recognize the contract. It will be observed, however, that he did not place the repudiation upon the ground that Robinson *had no authority* to purchase or contract for charcoal. Here are the grounds for the disavowal, in his own words: "Mr. Robinson had no authority to purchase or contract for large quantity of charcoal for our company." The jury might well infer from this reply, taken in connection with the suggestive character of the letter of inquiry from Wick, that Robinson had authority both to purchase and contract for charcoal for the smelter, an implication arising from the reply that he was limited only as to the quantity. Such limitation, however, would be of no force in the absence of notice to the other contracting party.

Wick attempts to excuse himself for receiving and paying for coal upon this contract from May 2d to June 24th upon the plea that he supposed Robinson had authority to make it. That is just what Armstrong sup-

posed, and the indications are strongly to the effect that both the general manager and the vendor had good reason to believe in Robinson's authority.   The former, as Mr. Higgins says, *was an owner in our concern*, and having acted as general manager for several days prior to the delivery of any coal under the contract, doubtless supposed that he understood the details of the whole business.   A duplicate of the contract was in his office, and he had ample opportunity to examine it, ascertain how the price therein stipulated compared with the market price, and to inquire into the authority for making it.   The other party, Armstrong, had known Robinson since his arrival in Leadville.   He knew of his contracts, both for the smelter and the mines, and had, according to his testimony, received money paid by him for work done on mines of the company.   He judged, from the character of his dealings and the apparent recognition of his agency, that he was authorized to contract for supplies, both to build and to operate the smelter.   That an agency may be proved by the habit and course of dealing between the parties is clear upon principle and authority.   *Union G. M. Co. v. Rocky Mt. Nat. Bank*, 2 Colo. 570; *Franklin v. Globe Ins. Co.* 52 Mo. 461.

We do not lose sight of the fact that one member of the company testified that Robinson had no authority to contract for supplies, and that another member, Higgins, testified that he was not authorized to contract for a large quantity.   In connection with this, however, must be considered other testimony in the case, which shows that during the period in which Robinson was the sole representative of the company at Leadville he looked after certain outside matters, all of which, however, had reference in some degree to the general business of the company, and connected with its smelting operations. A person situated as plaintiff was would naturally, therefore, suppose that the agent was duly authorized to contract for all materials in any way relating to the smelting

works. It is our best judgment that the jury would have been warranted in finding that the agent Robinson had original authority to contract for the charcoal.

The next question to be considered is that of ratification. If the acts and conduct of the company did not amount to an original authority for the making of this contract by Robinson, has not the company, by its subsequent acts, ratified or adopted it? We have seen that Mr. Wick was appointed general manager of the company after the making of the contract, but before anything was done under it and while it remained executory. He arrived in Leadville after his appointment, some time in April,— probably about the 15th of that month. His powers, as stated by Mr. Higgins in his deposition, were "a general management of all our affairs in Leadville connected with mines and smelter, and he was authorized to make contracts." Mr. Wick himself thus states his powers: "With full power to make all contracts, purchases and sales." The American Smelting Company was not a corporation, but a copartnership. The testimony, however, does not warrant the inference that it was an ordinary or commercial partnership, since no partnership organization was shown. It appears to have been an association of individuals for the purpose of prosecuting a certain business venture, which was the operating of mines and smelting works at Leadville. It may, therefore, be appropriately denominated a "mining partnership," since the business related to mining projects. It was held in *Charles v. Eshleman et al.* 5 Colo. 111, that a mining partnership exists where the several owners of a mine co-operate in the working of the mine. Here the several owners in the "concern," as Mr. Higgins calls it, co-operated in carrying on certain mining operations.

The courts hold that a mining partnership is governed by many of the rules relating to ordinary partnerships, but differing therefrom in many important particulars;

as, for example, a member may assign his interest without the consent of his copartners, and the act does not work a dissolution of the partnership. The person to whom the interest is assigned becomes a member of the company, and it is not necessary that the other members consent thereto. Neither does the death of a member dissolve the partnership; new members come into a mining association against the wishes of other members. On the other hand, a mining partner has not the power to bind his associates by engagements with third persons to the extent that a member of a trading or commercial firm may do. In illustration of this principle, it was held that the law does not imply authority to a member of a mining partnership to execute a promissory note, or to draw or accept a bill of exchange, in the name of the firm; also, that the act of employing counsel to litigate the title to a mine does not come within the limited powers vested in a mining partner, but that the powers of members and managers of such companies are limited to the performance of such acts, in the name of the partnership, as may be necessary to the transaction of its business, or which is usual in like concerns. It is further stated that a partnership may be formed for mining purposes that would possess all the elements of a commercial partnership, and which would subject its members to the same rules and liabilities.

So far as the powers of a partner to bind the firm in the usual course of the partnership business is concerned, it is held that the same principles apply in mining partnerships as in the case of ordinary partnerships. The rule upon this subject, as announced in Pars. Part. 95, is that every partner has full and absolute authority to bind all partners by his acts or contracts in relation to the usual business of the firm, in the same manner and to the same extent as if he held full power of attorney from all of the members, and that this principle rests, not only on universal usage and on universal authority, but on

obvious reason and necessity. *Charles v. Eshleman et al. supra*, and cases cited. In accordance with this principle it was held in *Manville v. Parks et al.* 7 Colo. 135, that where a member of a mining partnership purchased articles essential to the carrying on of the business, the debt being created in the necessary and usual course of the business, and within the scope of the partnership venture, the individual member who made the purchase had lawful authority to contract the debt, and to bind his copartners thereby.

The regularity of Robinson's appointment as an agent of the company is not disputed, but the defendants allege that he exceeded his powers in entering into the charcoal contract. They also contend that it was never legally ratified either by Wick, the general manager of the company, or by the company. Whether it was ratified by the company or not depends upon the facts in the case. The. regularity of Robinson's appointment as a representative of the company being conceded, it follows, as a necessary sequence, that the company was chargeable with knowledge of the scope of his powers as agent. If, then, Robinson exceeded his powers in assuming to bind the company by the charcoal contract, it became the duty of the company to disavow the act within a reasonable time after notice in order to avoid liability thereon. If the company remained silent for an unreasonable length of time after actual or constructive notice of the existence of an unperformed contract for supplies for its smelting works, with notice that tender of performance had been made by the contractor, Armstrong, and that the charcoal contracted for was being received and paid for by Manager Wick according to the terms and conditions of the contract, such silence would raise a presumption of ratification. We have already alluded to the plenary powers conferred by the company upon Mr. Wick, as agent and manager of the company. It is a well-established rule of law that notice to the agent is

notice to the principal of matters falling within the scope of the agency.    Power to make contracts for supplies to run the smelter was peculiarly within the scope of Wick's agency.    It becomes material, now, to know when the existence of this contract came to his notice.

Mr. Wick admits that he saw a duplicate of the contract in the office of the company, but apparently evades the inquiry, when it first came to his notice.    The interrogatories and answers upon this point are as follows:

"*Interrogatory 10.* When did you first learn of the existence of a certain contract or agreement for the purchase of charcoal from the plaintiff, and made with him by Robinson, pretending to act for and represent the defendants?    *Answer.* I don't remember the exact time. My recollection is that some time after I arrived in Leadville, in looking over some papers, I found that contract. *Int. 11.* When did you first see the contract?    *A.* I saw it as stated in interrogatory 10, and that was the first I ever heard of it."

These answers, taken in connection with his statement of the time of his arrival in Leadville, to wit, "*in the month of April*," are rather indefinite.    The inference from his acts and testimony is that he saw the contract before any coal was delivered thereon.    Mr. Armstrong commenced delivering coal to the smelter, as stated, on May 2d.    Mr. Wick received the quantity delivered on that day, and continued to receive the coal as it came, the daily average being about three hundred bushels, until an aggregate of thirteen thousand seven hundred and seventy-three and one-half bushels had been received, and payment made thereon according to the terms and conditions of the written agreement.    It is evident, therefore, that he was acquainted with these terms and conditions from the first.    One of the conditions was that ten per cent. of the contract price was to be retained by the company as security for the full performance of the agreement on the part of Armstrong.    So far as the evi-

dence shows, no objection was made known to the plaintiff by Mr. Wick that the contract was not a valid one, or that there was any want of authority on the part of Robinson to execute the same, or that the coal was of inferior quality, until the 24th day of June, at which time Wick refused to receive any more coal upon the contract, alleging as ground of refusal that the coal was of inferior quality. Mr. Wick attempts to explain away the legal effect of his action in receiving a large quantity of coal upon the agreement before disavowing it, by claiming that he did not know of the extent of Robinson's powers as agent of the company, but supposed he had authority to contract for supplies for the smelter. During all this time Mr. Robinson remained in the employ of the company, as is apparent from the testimony of Higgins, who says, in his deposition, that he thinks Robinson remained several months with the company after the appointment of Wick, his duties being to superintend the smelting of ores and the mixing and assaying of ores.

It does not appear from Wick's testimony or otherwise that he made a single inquiry of Robinson, or of any member of the company, concerning the authority of Robinson to enter into the contract, on the part of the company, until the 14th day of June. But the significant fact does appear, both from Wick's letter to Higgins and from other evidence, that, when he did commence to inquire about Robinson's authority in the matter, the price of charcoal had declined in the market from seventeen cents, the contract price, to eight and ten cents per bushel. In view of the relation which Wick sustained to the company, and the knowledge which he possessed by the inspection and custody of the duplicate contract, his failure to inquire into its validity before proceeding to perform it on behalf of the company is not avoided by the explanation offered, that he supposed Robinson had authority, as agent of the company, to make it.

The situation may be illustrated by that of a single principal and a single agent. The agent contracts for articles necessary to the business of the principal, but the contract is outside the scope of the agent's authority. While it remains wholly unperformed and simply executory the contract is brought to the notice of the principal. Afterwards, tender of performance is made by the opposite party. Will it be contended that the principal may remain silent, and join the opposite contracting party in performing the contract, until, from change of circumstances, it becomes his interest to repudiate it, and that he may then do so on the ground of want of authority in the agent to enter into the agreement? The case here presented does not differ, in legal effect, from the one supposed, upon the facts appearing in the record before us. An owner in the company, whose relation to it may be found by the jury to be that of a partner, is put in charge of the entire business of the firm. His acts are those of the company. His authority extends to the making of just such contracts as the one in controversy. He has not only notice of its existence, but voluntarily enters upon its performance, and continues in such performance for a period of fifty days. All these things come within the scope of his authority. The agent, then, has notice of the contract, its terms and conditions, and of the tender of performance. He accepts the coal as delivered on the contract without inquiring into the validity of the written agreement, shutting his eyes to the means of knowledge within easy reach. The law applicable to such facts is that notice of the matters aforesaid to the agent is notice to the company, and that the acts of the agent are the acts of the company. Upon such a state of facts, and after such long silence, the company cannot avail itself of a lack of authority in Robinson to make the contract.

The rule laid down in Whart. Ag. §§ 177, 178, is that the principal is bound by all notices coming to the agent

relating to matters within the scope of his agency, when such notices would have bound the principal if given directly to himself. Mr. Story announces the principle that notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of the agency. He puts it upon the ground that, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal, and if he does not, still the principal having intrusted his agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal; otherwise the negligence of the agent, whether designed or undesigned, might operate injuriously to the rights and interests of such party. Story, Ag. § 140. This court has held that notice of facts to an agent, where the matter is within the scope of his agency, affects the principal, though not in fact communicated. *Union G. M. Co. v. Rocky Mt. Nat. Bank*, 2 Colo. 565. Another rule applicable to the present case is that notice to an agent is notice to the principal, if the agent comes to the knowledge of the fact while he is concerned for the principal, and in the course of the very transaction which becomes the subject of the suit. *Hiern v. Mill*, 13 Ves. 120; Ewell's Evans, Ag. 159.

Counsel for appellant rely upon a doctrine laid down in Story, Ag. § 239 *et seq.*, to the effect that unless the ratification by a principal of the acts, doings or omission of his agent be made with full knowledge of all the circumstances of the case, it will not be obligatory upon him, whether the principal's want of knowledge arises from the design, concealment or misrepresentations of the agent, or from his own innocent inadvertence. This doctrine may be applicable to the case of a special agency, as the employment of an agent for a single transaction, or it may be applicable to completed trans-

actions, but it is not applicable to executory contracts, involving the features of the present case.

Counsel also rely upon the following paragraph, taken from the syllabus of the case of *Combs v. Scott et al.* 12 Allen, 492:

"Ratification of the unauthorized acts of one who assumes to be an agent, in order to render them binding upon the principal, must have been made with full knowledge of all material facts, and ignorance of such facts, whether it arises from want of inquiry by the principal and neglect to ascertain the facts, or from other causes, will render an alleged ratification ineffectual and invalid."

Upon these authorities it is contended that the acts of Wick did not operate to bind the company, because he was, at the time, ignorant of the scope of Robinson's authority. We have shown why such ignorance as that claimed by and in behalf of Mr. Wick does not avail. It was voluntary and wilful ignorance, where the means of knowledge was at hand. It was in a case where the person contracting to furnish supplies had relied upon the authority of an agent of the company, who had been permitted, if not authorized, to act generally for the company in relation to the same class of business, the company recognizing his acts by paying the bills so contracted, whereby this party was misled to his prejudice. The case from 12 Allen was in relation to a contract to procure two recruits, and to secure their enlistment in the United States army. It was that of a special agency, confined to a single transaction, and the services were to be performed for a stipulated consideration. It is in no manner analogous to the case before us. Besides, that portion of the syllabus above quoted does not truly state the ruling of the court. The rule announced was that the ratification of a *past and completed transaction,* into which an agent has entered without authority, is a purely voluntary act on the part

of the principal, and no duty requires him to make inquiries concerning it. But the case further holds that a person cannot be wilfully ignorant, or purposely shut his eyes to means of information within his own possession and control, and thereby escape the consequences of the ratification of unauthorized acts into which he has deliberately entered. The rule was confined to a past and completed transaction, not to an executory contract, where constructive notice of the contract was brought home to the principal before ratification. The company had constructive knowledge that Robinson had made a contract with Armstrong for supplies, and of the terms and conditions specified therein, before any steps were taken to perform it, either by Armstrong or Wick. This was knowledge of all the essential facts necessary to a ratification by the company. The company failed to disavow the act upon discovery of the existence of the contract, and for an unreasonable length of time after the plaintiff commenced performance on his part. Such long-continued silence gives rise to a presumption of ratification by the company. *Union G. M. Co. v. Rocky Mt. Nat. Bank*, 1 Colo. 531; *S. C.* 2 Colo. 565.

Another view of the case may be predicated upon the theory of Wick's relations as a copartner with Higgins, Otis, Ayer, and other members of the association. He was sued as a member of the firm. His ownership therein was affirmatively asserted in the deposition of Higgins, and it was not positively denied by Wick himself. Although not one of the original members of the association, his interest attached before going to Leadville. When asked by defendants' counsel who composed the firm or association, he answered by giving the names of those who were members "in the early part of '79." This answer evidently referred to the original members of the association. Being asked by plaintiff's counsel, on cross-examination, whether there was an association of individuals, of which he was a member, formed for the pur-

pose of transacting business in Lake county under the name of the American Smelting Company, he answered: "There was an association known as the American Smelting Company, in which I had a conditional interest." What the *condition* was he does not state, nor was there anything in the testimony to show that his interest did not constitute him a member of the company.

On the other hand, Mr. Higgins' testimony tends strongly to show that Mr. Wick was a member. Mr. Higgins stated in his deposition that, upon the completion of the smelter by Robinson, "Mr. Wick, being an owner in our concern, went out to take general charge." Upon the testimony the jury may have found his relations to the company to have been both that of proprietor and general manager. As a member of the partnership, he would be chargeable with notice of the appointment of his agent, Robinson, and of the scope of his agency. He would, consequently, be estopped from pleading his ignorance of Robinson's authority as an excuse for the course pursued by him in so long treating the contract as a valid one. Having plenary powers in such matters, both as principal and agent, his acts in carrying out or performing the contract would be equivalent to an adoption of it. Its adoption by Wick would have validated it to the same extent as if originally signed by his own hand instead of the hand of Robinson. Under the same view of Wick's relations to the company, his acts would amount to a ratification of the contract, and be equally binding upon the company. The objection made to the quality of the charcoal which was being delivered under the contract at the time of Wick's refusal to receive any more thereon does not appear to be supported by the evidence; hence this ground of repudiation cannot be sustained.

The foregoing views are supported by the following rules and citations: "If one partner enter into a transaction with third persons, within the scope of the part-

nership business, all members of the firm are bound. Pars. Part. 219.   Every member of an ordinary partnership is its general agent for the transaction of its business in the ordinary way, and the firm is responsible for whatever is done by any of the partners, when acting for the firm within the limits of the authority conferred by the nature of the business it carries on.   The principal is bound by the ratification or adoption of transactions by his agent, if the agent had the authority to do the thing which he ratified or adopted.   *Whitehead v. Wells*, 29 Ark. 99; *Irwin's Appeal*, 85 Pa. St. 299; *Palmer v. Cheney*, 35 Iowa, 281; Ewell's Evans, Ag. 54.   The supreme court of Alabama says:   "Both principal and the agent may ratify acts of an unauthorized person, and the principal is bound by the ratification or adoption of its agent if the agent had authority to do the thing which he ratified or adopted.   *Mound City Mut. Life Ins. Co. v. Huth*, 49 Ala. 539.   The distinction made between ordinary partnerships and mining partnerships does not interfere with the above principles in their application to the present case.

The objection urged by appellant to the third instruction given on the part of appellee cannot be sustained, since the instruction contains no fatal error.   It is true the instruction is inartificially framed, but the propositions of law contained therein are substantially correct. The first proposition is based upon the theory that the defendants "authorized or permitted" their agent, Robinson, to act generally for them in and about their business in and about Leadville, and that, acting under such authority, he made the contract in question, and deposited it in a proper place in the office of the company.

The jury is then informed that if such be the facts, and that the company proceeded through their agent, Wick, without objection, to perform the contract on its part, they may find either an original authority in the agent or a ratification by the principal.   The second

proposition relates wholly to a ratification of the act of the agent Robinson by the company, after full information through Wick of the existence of the contract. This proposition is, that if defendants, through Wick, after being fully informed of the making of the contract, proceeded to acknowledge its validity, and to act under it by receiving and paying for the coal as delivered, the jury may conclude from such transactions that the company ratified the contract. The legal propositions here laid down do not seem to be in conflict with the views which we have advanced, nor with the authorities cited in support thereof.

The remaining questions presented by the record are of minor importance, and may be briefly disposed of.

The second and tenth assignments of error relate to the measure of damages and involve one interrogatory and one instruction to the jury. The plaintiff was asked upon the witness stand the following question: "Mr. Armstrong, what was the market price of charcoal on the 19th day of June, 1879?" The objection made at the time was a general one. The specific point now made is that the inquiry was not limited to some place in particular. Had this objection been made at the time, it is probable that the question would have been changed so as to obviate the objection raised.

A similar objection was made to the second instruction. It lays down the rule of damages, in case the jury find for the plaintiff, to be the difference between the contract price and the market value of charcoal at the time the defendants refused to carry out the contract. That the element of place was not mentioned in the question to the witness, and in the instruction to the jury, cannot be held to be error in the present case, for the reason that no other market place than Leadville was referred to in the trial of the cause. It was therefore impossible for the jury to have misunderstood to what place the testimony and the instruction referred.

We are also of opinion that the rule of damages laid down by the court was correct.

The fourth assignment of error relied upon was the overruling by the court of appellants' objection to the question propounded to the witness Gerrish requiring him to state whether, during the time the coal was being delivered and used at the furnace, he heard any objections made to its quality. The answer to the question was, "None whatever." It is argued that this answer was misleading to the jury because no relations existed between appellants and the witness Gerrish which required appellants to complain to him or in his presence of the charcoal. The question appears to have been a proper one, considering the qualifications and opportunities of the witness to judge of the quality of the coal delivered. The testimony of Mr. Gerrish shows that he was employed as an expert in the works to assist Robinson in getting them properly started; that he was familiar with the smelting of ores; was by profession a metallurgist, having had, as he states, a good many years' experience in smelting ores with the use of charcoal; and that the duties imposed on him by the appellants were to instruct the men how to mix the ores and coal to make it burn, and how to prepare their furnace in order to make it run. In reference to this process of smelting by the use of charcoal he states that he was the first to introduce it into Leadville. It also appears from the testimony of this witness that he was in the employ of the appellants a sufficient length of time to be able to judge of the character of the charcoal being delivered by Mr. Armstrong. In addition to answering the question that he heard no objection whatever to the coal delivered by Armstrong, he said he had remarked, on seeing some of the coal delivered, that it was the best charcoal he ever saw burned in pits, and that he heard no complaint from Robinson. Another objection is that the question referred simply to the character and quality

of the coal being delivered, whereas the testimony shows that it was also to be free from stones and dirt. The contract was in writing, and in reference to the character and quality of the charcoal it merely says that the appellee was to deliver "seventy-five thousand bushels of well-burned charcoal."

The eighth assignment questions the correctness of an instruction given by the court upon its own motion relating to the allowance of interest upon the sum admitted to be due the appellee at the time of the refusal to receive any more coal upon the contract. The jury were instructed to allow interest at the rate of ten per cent. per annum upon the sum of $485.47, admitted to be due appellee, but not to allow interest on the sum contested, if they should find the appellee entitled to any other or further sum of damages. This assignment is considered in connection with the sixth assignment of errors, which latter assignment relates to an instruction prayed for by appellants and refused by the court. The latter instruction asked the court to instruct the jury that, if the appellants, before suit brought, had tendered the sum of $485.47, without any restrictions, in payment of the amount then due appellee for charcoal delivered, and that he refused to receive it, no interest should be allowed upon such sum. We have considered the evidence relating to the tender, and the testimony of defendant Wick, alone, shows that no unconditional tender was made. There was, therefore, no error in giving the appellee's instruction, or in refusing that prayed for by appellants.

We have examined all the errors assigned, and find none of sufficient importance to justify a reversal. The judgment is affirmed.

*Affirmed.*