[No. 8318.]

## NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY v. FARNSWORTH.

1. INSURANCE—*Fraudulent Misstatements of Insured—Evidence—Burden of Proof.* Where the defense to an action upon a life insurance policy is willful false statements of the insured in his application, the burden is upon the insurer to satisfactorily establish the fraud. The courts will not accept conjecture, speculation, or doubtful inferences. That the insured was himself a physician, does not warrant the inference that he was at the time conscious of an infirmity which the examining physician failed to discover. (334.)

2. —— *False Report of Medical Examiner.* If the medical examiner of a life insurance company deliberately withholds from his principal knowledge of a disease or infirmity of one applying for insurance, which infirmity, so far as appears, was unknown to the applicant, the insurer and not the insured is affected by the concealment. (337.)

3. EVIDENCE—*Materiality.* Action upon a policy of life insurance issued in 1910, upon the life of a physician. Defense, willful misstatements of the insured in his application. The deposition of another physician that, in 1905, the insured told him he was going to New Mexico for his health, and declined an offer of the witness to make a physical examination of him, *held*

immaterial to the issue. So the testimony of the publisher of a newspaper at the former residence of the insured, that it was generally understood that the insured quitted that residence and went to New Mexico for his health. (334.)

So the testimony of medical directors of the insurer at the home office, that if the application had disclosed severe asthma, or other diseases mentioned, the application would not have been accepted without further investigation. (335.)

So the deposition of witnesses who knew the insured in 1906 while residing New Mexico, that the insured had attacks of asthma, but was otherwise in good health. (335, 336.)

4. —— *Non-Production of Material Testimony.* Action upon a policy of life insurance. Defense willful misstatements of insured in his application. The failure of defendant to call the physicians who assisted the medical examiner in the autopsy observed upon. (336.)

*Error to Morgan District Court.*   Hon. H. P. BURKE, Judge.

Mr. WILLIAM R. NETHERCUTT, and Messrs. TAYLOR & PENDELL, for plaintiff in error.

Mr. C. C. RICKEL, Messrs. COEN & COEN, and Messrs. BENEDICT & PHELPS, for defendant in error.

Mr. JUSTICE SCOTT delivered the opinion of the court.

This is an action by the defendant in error to recover upon a life insurance policy in the sum of $2,000 issued by the plaintiff in eror, to the husband of complainant. The policy was dated January 3d, 1910, and the insured died October 12th, 1910.

The answer admits the issuance of the policy and the payment of all premiums, but alleges false statements and answers to certain questions in the application for insurance, and that the insured for a long time prior to the application and at the time thereof, had been rapidly declining, had numerous and repeated attacks of asthma, coughing spells, expectoration and lung disorders; that deceased was affected with a chronic constitutional disease called emphysema; that he was a physician and surgeon; well knew his

diseased condition, and that he was not an insurable risk at the time of his application.

These allegations in the answer were denied generally by the reply; estoppel was also pleaded upon the ground that the defendant's medical examiner had knowledge of the physical condition at the time of the examination, and that the company had discovered the physical condition of the insured in June or July, prior to his death in October, and had not cancelled the policy.

The testimony was entirely by deposition. The cause was tried to the court without a jury who made a general finding for the plaintiff, and rendered judgment accordingly.

The specific allegations of the answer as to the alleged false statements are the following:

"Q.   When were you last confined to the house by illness?   How long?   What nature?   A.   Five years ago, asthma, two weeks.

Q.   When did you last consult a physician, and for what?   A.   As above.

Q.   Have you fully recovered and are you now in good health?   A.   Yes.

Q.   Give name and address of physician who attended you?   A.   Dr. F. D. Rogers, Littleton, Colorado.

Q.   Have you had since childhood any of the following diseases or disorders, asthma or shortness of breath?   A. Yes.

Q.   Pleurisy, bronchitis, pneumonia, or any chest or lung disease?   A.   No.

Q.   Have you had since childhood any chronic or constitutional disease or severe injury not fully set forth above? A.   No.

The only testimony admitted by the court aside from the documentary evidence, was the depositions of Dr. W. W. Claybaugh, examiner for defendant company, who made the

medical examination of the insured, and E. J. Richards, the local agent of defendant company at Ft. Morgan, where the insured resided. All other depositions were rejected.

Claybaugh testifies that he had known Farnsworth for about two years, and had just an ordinary professional acquaintance with him prior to the application and examination; that about a week prior to that time Farnsworth had moved into the office with the witness, for the purpose, and upon a conditional understanding, that Farnsworth was to purchase the equipment and practice of the witness. That he wrote the answers of Farnsworth found in the application, and made a physical examination of him at the time. That he did not know of Farnsworth's trip to New Mexico, referred to in the application, did not know of his taking any trips for the benefit of asthma, or any other trouble during his acquaintance, except what was said by Farnsworth in the application. Does not know that any other physician had given an opinion that the insured was not safely insurable.

He says that he intimated to Farnsworth that he reluctantly recommended him as a good risk, and intimated that he did not think he was a first class risk; that based upon the physical examination, he was of the opinion that Farnsworth had what is technically known as emphysema, but does not say that he told Farnsworth, or even intimated to him that in his opinion he had any such disease.

He says he recommended the insurance, first, for the reason that he recognized emphysema in that particular form was not necessarily a fatal disease, and secondly, because of the fraternal feeling he had for a co-practitioner.

The following questions and answers appear in the testimony of Claybaugh:

"Q. Doctor, is it not a fact, that, after you informed Dr. Farnsworth of your unwillingness to recommend him that he insisted upon your recommending him because of

the needs of his family, and that you consented to so recommend him by reason of such overtures made by said Farnsworth? A. If you mean, Mr. Taylor, by the word overture, that there was any suggestion other than friendship or sympathy for a fellow practitioner, I would say no. What he said was, that he needed the insurance and expected me to get it for him.

Q. What did he say to you about his physical condition? A. He said that I couldn't find anything wrong with his lungs, he denied that he had tuberculosis, and he defied me to find anything wrong with his heart. I found nothing wrong with his heart at that time, that is, that it was acting regularly, very substantial work at that time."

He further testifies that Farnsworth never consulted him about his condition; that he did not know whether Farnsworth had diminished or increased in weight within a year prior to the examination. That he did not think the applicant had recovered from his illness of five years before, but that he had no personal or professional knowledge of any illness subsequent to that attack. That Farnsworth had spells of coughing, but that up to the time he moved into witness' office he was not associated with him enough to know how frequent the coughing spells occurred. That after he came into the office, whether before or after the application was written, does not appear, he had frequent coughing spells, but that these were not violent, and there was not much expectoration. That while associated with witness in the office, Farnsworth seemed to attend to his business regularly.

He then testifies that he performed an autopsy upon the body of Farnsworth, assisted by others, and as follows:

"The thoracic cavity was explored and we discovered the pleural sack full of liquid. The lungs themselves were saturated with fluid; the heart was dilated and I believe that was as far as our post mortem examination went. We did explore the abdominal cavity. We found that full of

liquid  *  *  *  the kidneys were removed and on close examination of the kidneys we did not find them diseased by this close examination, although we removed and examined them  *  *  *  in fact about all the hollow organs were oedematous and somewhat dropsical  *  *  *  we found emphysema of the lungs and I believe I said a dilated heart and the pleural sack was full of liquid and the lungs themselves.  The direct cause of his death was dyspnoea of the lungs, and the indirect cause was emphysema, which was the occasion of the labored breathing."

He further says that "This oedema or dropsy of these hollow organs of the body did not exist at the time of the examination."  Then follows questions and answers:

"Q.  Do you know of your own knowledge that at the time you made some or all of these observations, he might not have had a local ailment such as influenza, hard colds, etc?  A.  I presume he might of had.

Q.  As a matter of fact doesn't your opinion rest upon the information gained and observations made after this examination was made, January 3d, 1910?  A.  At that time and subsequent to it, yes, sir.  At the time of the examination I informed Mr. Richards, the agent of the company, and I protested that I didn't consider him a good risk.  This was before the papers were sent in.  Richards did not make a request that I make a favorable examination.  When I protested to Richards, he simply notified me to forget it."

Analyzing this testimony, we find that this witness says that upon his examination of the applicant, he found emphysema, but he does not say that he told Dr. Farnsworth of this, and there is nothing in his testimony or that of any other witness to indicate that the deceased knew at the time of his application for insurance that he had emphysema, if he did have it at all.  Nor is there any testimony upon the part of any other witness admitted or offered, that even suggests that the insured had the disease of emphysema at that time.

Counsel for the company urge that the insured was a physician and for such reason must have known that he was so afflicted. Claybaugh's testimony in this respect was at best but the statement of a professional opinion, reached at the time of the examination, and apparently without other basis than the physical examination.

To hold that Farnsworth, because only of the fact that he was himself a physician, held the same professional opinion can be no more than an inference at best, particularly when not supported by proof in the case. The defense ` is that the insured knowingly and wilfully perpetrated a fraud upon the defendant in this respect. The burden was upon the defendant to satisfactorily prove this fraud, and the courts will not accept guess work, speculation or doubtful inferences as satisfactory proof.

The only testimony in the case bearing upon what the insured thought or believed at the time, as to his having any affection of the lungs, is that of this witness Claybaugh, who says that Farnsworth, at the time of the examination said to him, "You can't find anything the matter with my heart or lungs."

If Claybaugh believed that Farnsworth had emphysema at the time of the examination, he admits he concealed that fact from the company, his principal, and did not make it known to Farnsworth, the insured, and so far as the record discloses, to any other person.

He nowhere testifies that Farnsworth had asthma at the time of the examination, or that he ever knew him to be afflicted with asthma or that he knew anything in regard to that matter, save and except the answer in relation thereto contained in the application.

It is true that he testifies that after Farnsworth came into his office he had at times difficult breathing and coughing spells, but admits that this might have been the result of influenza, bad colds, etc.

Coming now to the testimony of the witness as to the

autopsy, he says, the pleural sack was full of liquid; the lungs saturated with fluid, the heart was dilated; the kidneys were sound; all the hollow organs were oedematous and somewhat dropsical. We found emphysema of the lungs. That the direct cause of his death was dyspnoea of the lungs, and the indirect cause, emphysema.

We find that dyspnoea is defined by Webster as, in its medical sense, difficult or painful breathing. This painful breathing was caused by the presence of emphysema, is the testimony of the witness. He also testifies that the oedema or dropsical condition did not exist at the time of the examination and that the heart was at that time sound.

Asthma is defined as a disease characterized by difficulty of breathing, due to a spasmodic contraction of the bronchi, recurring at intervals, accompanied with a wheezing sound, a sense of constriction in the chest, a cough and expectoration.

It will be observed that the witness does not testify that he found the deceased afflicted with asthma, either before or at the time of the examination, nor that there was any evidence of it appearing upon the *post mortem,* if evidence of that disease may appear after death, so that in so far as this witness is concerned, there appears nothing to refute the statement of Farnsworth in his application in this respect.

It appears that emphysema is an entirely different disease from asthma, not of the bronchi, but of the lungs, and is a disease of the lungs in which the air cells are distended, and their partition walls ruptured by an abnormal pressure of the air in them.

The witness testifies that such a disease may exist for a period of many years, and that in the form in which he says Farnsworth was afflicted with it at the time of the examination, it is not necessarily fatal. But if we were to assume that the testimony of the witness is correct, that the insured was so afflicted at the time of the examination, and

that such disease was the sole producing cause of his death, ten months later, we fail to find any evidence that Farnsworth knew at the time of the examination that he was afflicted with such disease.

If he did not know this, he did not commit a fraud upon the defendant by the statements in his application, and there could not have been collusion in that particular, between himself and Claybaugh, the company's representative.

The testimony contained in the deposition of Richards, upon the part of defendant and admitted in evidence, is material and important only to the extent that it discredits the testimony of the witness Claybaugh. This witness was the local agent of defendant. In flat contradiction of Claybaugh, he testifies that he did not solicit Farnsworth for insurance, but that on the contrary the following occurred:

"As near as I can remember now, Dr. Claybaugh told me that he thought Dr. Farnsworth would take a couple of thousand dollars worth of insurance, and I told him I did not think Farnsworth was a good risk, although he ought to know—he was the medical examiner—and we talked it over. I do not remember what we said, but however, I told him that if he wished he could examine the Doctor, and if the medical examination was all right I would send it in with the application. I gave him the application and he took it and took the medical examination, and he filled in the application and gave it to me. I knew that Dr. Farnsworth had at some time been in ill health, but I presumed, Dr. Claybaugh being the medical examiner, that he would know whether he was all right or not."

Claybaugh testified that he told Richards that Farnsworth was not a good risk. Richards testified as follows:

"Q. You may state whether or not Dr. Claybaugh at the time of the examination or any other time informed you that Dr. Farnsworth was not a good risk. A. He did not.

Q. What was the extent of your knowledge with reference to the acceptability of the risk of Dr. Farnsworth?

A.  None; that is all up to the medical examiner.  He is supposed to report to the company whether the risk is good or not.

Q.  Is there a blank in the application for that purpose?  A.  Yes, sir.  Part of the instructions to the medical examiner that he is to recommend the risk or not to recommend it.

Q.  State whether or not Dr. Claybaugh ever protested to you against sending in this application?  A.  He did not.

Q.  You may state whether or not after the examination of Dr. Farnsworth by the examiner Claybaugh you and Dr. Claybaugh ever had any conversation relative to the risk.  A.  I do not remember any conversation.

Q.  I think you stated in your direct examination that you stated to Dr. Claybaugh that you did not believe Dr. Farnsworth to be a good risk?  A.  Yes, sir.

Q.  That was prior to the examination?  A.  Yes, sir.

Q.  You based that statement upon what?  A.  Well, I presume the general appearance of the man.

Q.  He was not a rugged looking man?  A.  He was not.

Q.  Mr. Richards, is it or is it not true that Dr. Claybaugh made an examination of Dr. Farnsworth for this insurance at your suggestion, or by your request?  A.  Why, he would have to make the examination at my request but Dr. Claybaugh suggested to me that Farnsworth would take $2000 worth of life insurance; as I said before, I told him that Farnsworth did not look like a good risk but he could go ahead and make the examination and that he was the medical examiner for the company and that he ought to know.

Q.  Is it or is it not true that Dr. Claybaugh made some protest or objection?  A.  It is not true.

Q.  Is it or is it not a fact that Dr. Claybaugh at the time of making this application, or in connection with it, protested to you that the risk was not first class; protested

on substantially-that ground; and that you replied to him to 'forget it?' A. It is not.

Q. Is it or is it not true that after the papers in connection with this application and examination were completed Dr. Claybaugh turned them over to you and told you he did not like to do that kind of thing, and you replied to him 'Just to forget all about it, it was all right?' A. It is not true.

Q. Neither in substance, if not in whole, nor in part? A. No, sir."

We now consider the question of the exclusion by the court of other depositions offered by the defendant. The first of these was that of Dr. Walter C. Crysler. The witness testifies that he purchased Farnsworth's practice in 1905 at Littleton, Colorado, and that the latter told him that he was going to New Mexico for his health. That after the purchase of Farnsworth's practice and before he left for New Mexico, witness volunteered to make a physical examination, which Farnsworth declined. This testimony is clearly immaterial to the issue, and was properly rejected.

The next was the deposition of John R. Harris, who published a newspaper in Littleton, at the time Farnsworth left for New Mexico. The witness produced and identified a local item noting a temporary illness of Farnsworth, the cause or nature or which is not suggested, and also a copy of the paper containing an editorial, eulogistic of Farnsworth's citizenship and professional acquirements. The witness also says that it was generally understood that Farnsworth left Littleton and went to New Mexico because of ill health, which is precisely what Farnsworth stated in his application. Just how such testimony can be material, is beyond comprehension.

Another deposition excluded, contained the testimony of Thorndyke, Fisher and Hathaway, officers of the company, all of whom resided at Milwaukee, Wisconsin, and none of whom knew anything of the matter save that which appeared

from the application itself. Two of these were medical directors of the company, and the only testimony material to the issue and in any sense favorable to the defendant, is to the effect that if the application had disclosed that Farnsworth was affected, with severe asthma, heart disease or emphysema, the application would not have been approved or accepted, at least without further investigation.

This may be conceded for the purposes of this case, and hence there was no error in rejecting these depositions.

Hathaway was the secretary of the company and his testimony relates to certain correspondence between officers and agents of the company, subsequent to the issuance of the policy and as to the customs of the company, all of which is utterly immaterial in our view of the case.

The deposition of R. S. Cravens shows that the witness worked for Dr. Farnsworth in a drug store in New Mexico, and that the latter had attacks of asthma during the months that he knew him in 1906, but was otherwise in good health. The witness was not a physician nor medical expert. Farnsworth's application shows that he went to New Mexico because of asthma. The time was more than four years before the date of the application, and therefore too remote to have any bearing upon the condition of Farnsworth in this respect, at the date of the application, and the testimony was properly rejected.

The deposition of Thomas B. Platt, shows that the witness knew Farnsworth a part of the time while the doctor was in New Mexico, that he hunted and fished with him; that he had no special opportunity to observe his health conditions; that he observed nothing to indicate that Farnsworth was not in good health, and that he appeared healthy. Just how the rejection of this deposition could have injuriously affected the defendant's case, is not apparent.

The deposition of B. H. Wixom discloses that the witness is a farmer and knew Farnsworth while the latter was

in New Mexico in 1906, and that he then had asthma.   The testimony was both incompetent and too remote.

Clearly there was no error in the rejection of any one or all of these depositions.   The trial was to the court and the record shows that the judge read the depositions before excluding them, and we have given all the testimony in these several depositions careful consideration with the conclusion that the testimony in neither one or all of them, can have any important bearing on the case.

Dr. Farnsworth lived and practiced his profession in Fort Morgan continuously for about three years immediately prior to his death.   It would seem that any reliable non-expert testimony as to the state of his health would naturally come from persons with whom he mingled or associated during that period of time.   But it is to be noted that not one resident of Fort Morgan or of Morgan County, was called upon to testify at the trial.   Even Richards, the local agent of the company, resided in Denver.   Yet the defendant has asked the court to consider the testimony of witnesses, who met Farnsworth during a temporary stay in the state of New Mexico, and who had not seen him for more than four years prior to his death.

The testimony does not establish that the deceased made any knowingly false declaration as to the condition of his health in his application for insurance.   It may be assumed that the producing cause of his death was emphysema.   It does not appear that this disease may not have been contracted after the policy was issued.

It is a singular fact that while Claybaugh testifies that two other physicians resident of Fort Morgan, where Farnsworth died, and where the insurance was applied for, and where the case was tried, assisted in performing the autopsy, yet neither of these were called to testify by defendant or otherwise.

The witness Claybaugh is the only witness who suggests that Farnsworth was affected with the disease em-

physema at or before the time of the application, and so far as the record discloses, he concealed this from the applicant and from the company, for whom he was acting. At the time of the taking of his deposition he appears to have removed from Fort Morgan, and to then have been a resident of the state of Utah. His testimony is so flatly disputed in important particulars by the testimony of Richards, the local agent, as to justify the court in discrediting the whole of it. But if we assume that he did believe that Farnsworth was afflicted with the disease of emphysema, and that he knowingly withheld such knowledge from his company, and that the company was for such reason alone, thereby defrauded, then the defendant was defrauded by the wilful act of its agent alone.

The testimony justifies no other conclusion, and under such circumstances the defendant is clearly estopped.

We cannot assent to the proposition that an insurance company may avoid its contract of insurance, upon a mere inference that the insured, solely because of the fact that he was himself a physicain, knew he was afflicted with a particular disease.

To justify such avoidance upon the part of an insurance company, the testimony should so satisfy the mind of the court as to be conclusive in that respect. So far as the record discloses Farnsworth was the only person who could have disputed the testimony of Claybaugh as to the presence or absence of the particular disease at the time of the application. Are we justified in assuming that if Farnsworth were still living, he would not have as flatly disputed the testimony of Claybaugh as did the witness Richards?

The medical examiner of an insurance company is universally held to be the agent of the company. Claybaugh says that he was of the opinion that Farnsworth had emphysema at the time of the examination. It does not appear that such opinion or knowledge was possessed by any other person. If Claybaugh was of such opinion then he deliber-

ately withheld the same from the company which employed him.

This brings the case within the rule laid down by this court in the well considered case of *State Ins. Co. v. Taylor*, 14 Colo. 499, 24 Pac. 333, 20 Am. St. 281, wherein it was said:

"Contracts of insurance, notwithstanding the intricate and complicated provisions contained in the policies,—perhaps found necessary to protect companies from fraud,—are to be considered and construed by the same rules of law and interpretation as other contracts, so as to carry out the intention of both parties, and hold each party responsible for his own wrong. Where there is on the part of the assured such intentional concealment, misrepresentation or omission as amounts to fraudulent conduct on his part in procuring the insurance, it should vitiate and avoid the contract, and he should suffer the direct results of his own misconduct; but where, on the other hand, there is shown no fraudulent or wrongful representation or omission on the part of the assured, and the wrong is perpetrated through the fraud or negligence of the accredited agent of the insurer, it would be neither just nor equitable to hold the insured responsible for it."

Again it was held in *Pacific Life Ins. Co. v. Van Fleet*, 47 Colo. 401, 107 Pac. 1087:

"The soliciting agent of the insured, in preparing the application for insurance, is regarded as the agent of the insurer, and his knowledge as the knowledge of the insurer. False statements in the application which the agent then knew to be false, cannot be made the ground of a defense to an action on the policy."

In *Merchants Mutual Ins. Co. v. Harris*, 51 Colo. 95, it was said:

"To the point that the soliciting agent, in preparing an application for insurance, is regarded as the agent of the insurer, and that his knowledge is the knowledge of the in-

surer, we cite: *Pacific Mutual Life Ins. Co. v. Van Fleet*, 47 Colo. 401, 107 Pac. 1087; *State Ins. Co. v. Taylor*, 14 Colo. 499, 24 Pac. 333, 20 Am. St. Rep. 281; *State Ins. Co. v. Du Bois et al.*, 7 Colo. App. 214, 44 Pac. 756; *America Ins. Co. v. Donlon*, 16 ·Colo. App. 416, 66 Pac. 249; *Strauss v. Phenix Ins. Co.*, 9 Colo. App. 386, 48 Pac. 822; *Ins. Co. v. Chamberlain*, 132 U. S. 304, 10 Sup. Ct. 87, 33 L. Ed. 341; *Ins. Co. v. Wilkinson*, 13 Wall. 222, 20 L. Ed. 617; *McMaster v. New York Life Ins. Co.*, 183 U. S. 25, 22 Sup. Ct. 10, 46 L. Ed. 64; *Sternaman v. Life Ins. Co.*, 170 N. Y. 13, 62 N. E. 763, 57 L. R. A. 318, 88 Am. St. Rep. 625; *Schollay v. Drug Co.*, 17 Colo. App. 126, 67 Pac. 182; *Higgins v. Armstrong*, 9 Colo. 38, 10 Pac. 232; *Hummel v. First Nat. Bank*, 2 Colo. App. 571, 32 Pac. 72, and *Messenger v. German-American Ins. Co.*, 47 Colo. 448, 107 Pac. 643."

The court quoted with approval the following from Story on Agency:

"Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal; and if he has not, still the principal, having entrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal; otherwise, the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights and interests of such party."

This doctrine cannot be denied in a case where as in the present, such knowledge appears to have been confined to the agent alone.

The findings by the court were general and must be held to include findings of fact as well as of law, and therefore to include a finding of fact as against the defendant upon its allegations of fraud. From a close examination of

all the testimony offered in the case we see no reason why such findings should be disturbed.

The judgment is affirmed.

GABBERT, C. J., and GARRIGUES, J., concur.