## SMITH et al. v. CONSUMERS' COTTON-OIL CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 1, 1898.)

No. 594.

**1. FEDERAL JURISDICTION—DIVERSE CITIZENSHIP—DISMISSAL OF PARTY.**

In an action against the members of a firm for breach of a firm contract, where one of the defendants is a citizen of the same state with plaintiffs, he may be dismissed without prejudice, and the action continued against the others.

**2. TRIAL—INSTRUCTIONS—BREACH OF WARRANTY.**

Contractors for putting on asbestos roofing warranted the roofs to remain water-tight for five years, provided the roofs were not damaged by fire "or other accident not traceable to the use of defective material or poor workmanship." The evidence tended to show that, before beginning work, the contractor called the attention of the owners to the unusually wide spacings between the rafters, but were assured that this was all right, and that the responsibility therefor was with the owners, and not the contractors. In an action for breach of the warranty, it was claimed that the leakages resulted from defective construction of the building. *Held,* that it was error to charge that as the contractors saw the building and the manner and materials of its construction, and went forward without modifying their contract, it was a warranty that the roof would remain water-tight on the building as constructed.

**3. CONTRACTS—MODIFICATION BY PAROL.**

A written contract may be modified before performance by parol agreement or understanding.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

Pressly K. Ewing and H. F. Ring, for plaintiffs in error.

J. C. Hutcheson, for defendants in error.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

McCORMICK, Circuit Judge. The Consumers' Cotton-Oil Company and Swift & Co., both Illinois corporations, being about to build certain oil-mill plants, contracted with H. F. Watson Company, a Pennsylvania corporation, and Smith, Peden & Co., the agents of H. F. Watson Company, to cover the same with asbestos roofing, and took from them a written guaranty, dated April 18, 1893, to the effect that they warranted the roofs to remain water-tight for the term of five years, and would repair any leakages free of charge for that time, provided the roofs were not damaged by fire or other accident not traceable to the use of defective material or poor workmanship. On March 13, 1896, the defendants in error brought their suit against "Ralph P. Smith, Edward A. Peden, and David D. Peden, Sr., late co-partners, doing business under the firm name and style of Smith, Peden & Co., at the cities of Houston and Waco, in the state of Texas," all of whom were alleged to be citizens of the state of Texas, and resident within

the Eastern district of Texas. The petition showed that H. F. Watson Company was not made a party, because it was not an inhabitant of or to be found within the state of Texas. It charged that the roofing put on the oil mill did not remain water-tight as warranted, and that the defendants did not repair it; that petitioners had been compelled to repair it, at a large expense, which they claimed the right to recover. The defendants Peden, besides other pleadings not necessary to detail, answered:

"That the plaintiffs solicited bids for roofing for said oil-mill plants, and solicited defendants and H. F. Watson Company to make bids to put on said building an asbestos roof. That defendants, together with Watson Company, did make bids to put on a certain kind of asbestos roofing on said oil-mill plants; and that, at the time of making said bids for said roofing, defendants were not advised of the plans and specifications of said oil-mill plants further than to ascertain the number of squares necessary to make said roof. That they had no knowledge or notice of the kind or character of superstructure that the plaintiffs intended to build to receive said roofing, but relied upon and supposed, of course, that the superstructure that plaintiffs would build to receive said roof would be the kind and character usually and ordinarily adopted and used in such buildings. Defendants were not advised by plaintiffs of anything to the contrary at the time of making said bid, or at any other time. That defendants made a bid to do said work, viz. to furnish the asbestos roofing, and put it on; plaintiffs being required by the terms of said agreement to do all the other work, so far as superstructure and material were concerned, to receive said roof. Defendants had no notice from any source whatever that the superstructure for said roofs were to be other than the ordinary and usual superstructure for roofs used upon such buildings, and never knew that the superstructure for said roofs was not the ordinary and usual superstructure used in erecting such character of building until after they had begun to do the work of placing the asbestos roofing on said mill plants. That, when they first began to put said roofing on said mill plants, it was immediately after the carpenters had first put the boards on the rafters of said mill plants to receive the roofing, and before the said boards so placed by said carpenters on said rafters had had time to warp or season by the effect of the weather and sun, or show that they would do so. That defendants had put but little roofing on said mill plants before they discovered that something was wrong with the superstructure of said roofs. Up to that time they had not seen, nor were they called upon to investigate, what the superstructure of said roofs was; but the surface of said roofs immediately after they were laid by the carpenters had the appearance of being tight and smooth, and presented a surface upon which roofs of the kind and character that defendants undertook to lay for plaintiffs could be laid with safety. But soon thereafter they saw that when the sun and weather had an opportunity to dry out the planks put upon said rafters on said mill plants to receive the roofing to be put thereon by defendants, that because plaintiff had put green and inferior lumber in said roof, the effect of the sun and weather on the said lumber was to dry out, shrink it, and cause said lumber to cup and warp and become loose and uneven. And, immediately upon noticing said defects in the superstructure of said mill plants, these defendants called the attention of plaintiffs and their agents and employés in charge of said mill plants thereto, and insisted upon the plaintiffs building under said roof more and additional support in the way of rafters or something else; but the plaintiffs refused to do so, assuring defendants that said superstructure was all right, and would be sufficient to hold said roofing in the proper manner, and would not warp and injure the roofing to be placed thereon by defendants. Defendants, however, advised and cautioned plaintiffs in regard thereto, and told them that such superstructure was not the kind and character of superstructure that they had figured upon putting said roofing upon, and was not the kind and character of superstructure ordinarily adopted and used for such character of buildings. Defendants, after receiving such instructions, and relying on said assurance from plaintiffs, proceeded to complete said roofing, and did put upon the superstructure placed there by plaintiffs a good and sufficient asbestos roof, of good material and in good workmanlike

manner; and that, if said roofs so placed there by defendants have leaked and given away in any manner, it was due and traceable to no fault of defendants' roof, material, or workmanship, but was due and traceable alone and exclusively to the deck or superstructure upon which said roofs were placed, defendant having no interest in, concern with, or control over the construction of said superstructure or deck upon which said roofing was placed. That, if the roofs placed upon said buildings by defendants have leaks in them, said leaks were caused and brought about exclusively on account of the following defective construction of said mill plants and the superstructure of said roofs, and is due to no other cause whatever: In the first place, defendants say that the rafters supporting said roof, and what is commonly known as the 'bearings' in said roofs, are ten feet apart, when they should only have been two feet apart. That the boards of which the superstructure is made, and upon which this roofing was laid, are less than two inches thick, and are eight inches wide, and twenty feet long. That they were placed in said roof while in a green, unseasoned state; and, as soon as the heat of the sun and the effect of the weather could dry out and season said boards, they warped up, some coming up in the center, some going down, some twisting up at both ends, and presenting and making such an uneven surface under said roofing that it tore the felting in many places, and that the warping and twisting and shrinking of said boards tore said roofing, and destroyed its usefulness as a roof. A great many of said boards so placed to receive said roofing shrunk so much that the shiplaps made to support and hold the boards against each other were pulled apart, and did not touch, and furnished no support whatever to the respective boards. That it was impossible to put any roofing of the kind contracted for on such superstructure that would have lasted its proper length of time. The defendants never saw, nor did any one else so far as defendants knew ever have any experience with, any such superstructure as was furnished by plaintiffs upon said mill plants to receive said roofing. The defendants say that, if any leaks occurred in said roofs, it was due and traceable exclusively to the fact that plaintiffs did not put such a superstructure as it was their duty to place upon said mill plants to receive the roof to be constructed by defendants; and it was the duty of plaintiffs to put a suitable superstructure on said mill plants to receive the roofing that defendants contracted to put thereon; and it was no duty of defendants nor were they in any way responsible for the kind or character of superstructure placed upon said mill plants by the plaintiffs to receive said roofing, and they are in no way liable or responsible for the failure of said superstructure so placed upon said mill plants by plaintiffs. And the failure of said roofs, if any occurred, is due and traceable exclusively to the condition of said superstructure on said mill plants, put there by plaintiffs, and not by defendants."

The defendant Ralph P. Smith, though not served with process, voluntarily appeared, and answered by a plea to the jurisdiction of the court, to the effect that he was a necessary party, and that he was at the time of the bringing of the suit, and still is, a citizen of the state of Illinois, of which state the plaintiffs are citizens. The court allowed the plaintiffs to amend their petition so as to make only the Pedens, citizens of Texas, defendants to their suit, and, on Ralph P. Smith's plea to the jurisdiction, to dismiss him from the suit without prejudice. Thereupon the Pedens pleaded to the jurisdiction of the court, on the ground that defendant Smith was a necessary party, and that, he being a citizen of the same state as the plaintiffs, the court had no jurisdiction to entertain the suit against him or against them alone. The motions and pleas of the defendants were overruled, and the case, proceeding to trial, resulted in a verdict and judgment for the plaintiffs.

Eight errors are assigned. The first five of these relate to the rulings of the circuit court on the pleas and motions touching the jurisdiction. They are none of them well taken. The action of the court

of which they complain is fully authorized by the act of February 28, 1839 (Rev. St. § 737), as construed in the opinions of the supreme court in Clearwater v. Meredith, 21 How. 489, Inbusch v. Farwell, 1 Black, 566, Barney v. Baltimore City, 6 Wall. 280, and many other cases.

The sixth error assigned is that the court erred in this part of its general charge to the jury:

"I charge you that, under the facts in this case, it being shown that the defendants, when they undertook to perform this work, saw the building, and saw the material of which it was constructed, its manner of construction, and although there was some dispute and some conversation between the parties as to whether it would hold the roofing or not, that the parties do not contend that they modified or altered the contract in any way, but went forward and ordered the work done. In that state of the case, it is my conclusion that it was a warranty on the part of the defendants that the roof would remain water-tight on that building as it was constructed. It might be true that if the leakages had been caused by something in the construction of the building that was not patent, or that could not be inspected by either party, such a state of affairs would constitute a defense; but where it was patent as to the construction, and where the material used in the construction was open to the observation of both parties, and, without changing the contract, they went forward with the work, and put the roofs on, and were paid for it, it was a warranty that the roofs that they were putting on would remain water-tight upon that building as constructed, and upon the material of which it was constructed, for a period of five years."

We are of opinion that this assignment of error is well taken. There is substantial conflict in the testimony to which the above charge is applicable. The bill of exceptions shows that the plaintiffs gave substantial evidence tending in a reasonable degree to prove the averments in their pleadings that the construction of their buildings and the character of the material were of the most approved standard; also that—

"Before commencing the roofing, one of the defendants, jumping on the superstructure, declared that, if a man could not put a good roofing thereon, he could not do it at all; also, that, before defendants began the roofing, the nature and kind of construction and of material of the superstructure were patent and open to observation to them; and, without the contract sued on being modified or altered in any way (unless the contrary is shown by the hereinafter quoted testimony of Peden), the defendants went forward and ordered the work done, which was performed and paid for under said contract, without any intimation from defendants that they would defend against the warranty because of the condition of said superstructure (unless the contrary is shown by the hereinafter quoted testimony of Peden); and, in reliance upon such warranty, the plaintiffs made to defendants payment in full under said contract, as they would not otherwise have done, supposing they were protected in so doing by such warranty."

The testimony of Peden just referred to is given substantially thus in the bill of exceptions:

"The defendant Edward A. Peden testified, among other things, that, as the work progressed, he observed an apparent imperfection in the superstructure in applying the roofing, arising from the giving of the boards; and, further: 'I examined these roofs after they were completed,—the superstructure,—before the roof was laid. I did this when we first began the first part of the work. I never had any experience with a roof with the bearings ten feet apart. That is the first one I had ever seen. I had conversations with these parties about that particular point. I called Mr. Yopp's attention to the distance they were apart. Our foreman, Mr. Sullivan, called my attention to it. Mr. Yopp, plaintiffs' general manager, told me that the superstructure was all right; that it had been thoroughly considered before being adopted, and there would be no difficulty about it;

that, if we did our part all right, there would be no trouble in connection with the matter. This occurred after part of the work was done, and I did not proceed to put on the rest of the roofing until after we had discussed the matter very thoroughly, and he gave me every assurance that they knew it was all right, and that that responsibility was theirs, and not ours. I never heard the word "toe-nailing" until it was suggested by some of their men in connection with the work. It is a new term to me, and struck me as being peculiar at the time. It was by no means a suggestion of mine. My suggestion was that there ought to be more rafters. I supposed, after they had assured me, and before I went on with putting on the roof, that they had investigated the matter thoroughly, —that they knew exactly what they were talking about, and that it could be thoroughly relied upon. I looked at the superstructure before any of the roofing went on. I saw its appearance before the roof went on. The first time I looked at it, it had the external appearance of being smooth. * * * I cannot tell the jury the exact words of Mr. Yopp in reference to the construction. I would not attempt to give his exact words. I cannot recall the exact words used by us at this long time. I said that the substance was that he thought the construction was sufficient. I stated more than that,—that they had made thorough investigation of that class of superstructure, and were fully satisfied that it was altogether sufficient, and that, if we did our work all right, there would be no harm to follow.' "

The pleadings of the parties and the testimony above recited present an issue of fact, which should have been submitted to the jury, but which was withdrawn from the jury by the language of the court's charge, wherein he says: "The parties do not contend that they modified or altered the contract in any way, but went forward and ordered the work done,"—which is repeated when he again says: "And, without changing the contract, they went forward with the work, and put the roofs on." The pleadings of the plaintiffs show that the contract was executed on behalf of the plaintiffs by one W. I. Yopp, thereunto duly authorized. The testimony of the defendants showed that after the execution of the written contract, and before any considerable part of the work was done, the defendants called Mr. Yopp's attention to the condition of the superstructure; and the result of their interview on that subject at that time was an assurance to the defendants that the plaintiffs knew "that the building was all right, and that the responsibility therefor was theirs [the plaintiffs'], and not ours [the defendants']." It is, indeed, not contended, either in the pleadings or in the proof, that there was any written modification of the written contract. But it was not necessary that the modification, if any, should be in writing; and, if the written contract requires or is susceptible of the construction placed upon it by the charge of the court (on which we express no opinion), it is clear to us that the testimony of the defendants tends to show a modification of it, and that that question, under the proper instruction, should have been submitted to the jury.

The seventh and eighth of the errors assigned relate to the refusal of the court to give certain requested charges. These charges sought to give the contract of warranty a construction that would limit the liability of the warrantors to such imperfections in the roof as were traceable to defective asbestos roofing material or to poor workmanship in putting it on the buildings. The occasion for such or similar requests may not recur on another trial when the issue as to the modification of the contract is submitted to the jury under proper instruction. In

anticipation, however, of the defendants' submitting such requests on another trial, we deem it appropriate to suggest that the requested charges refused are not formulated with sufficient clearness to convey helpful instruction to the jury. The tone is not judicial. The ramifications are too numerous and involved to require a trial judge to make a correct analysis and reduction of them, or permit their being given as tendered. On account of the error in the charge indicated above, the judgment of the circuit court is reversed, and the cause remanded to that court, with direction to award the defendants a new trial.