# CHARLESTON.

## CHILDERS *et al. v.* NEELY.

Submitted June 17, 1899—Decided November 28, 1899.

1. MINING PARTNERSHIP—*Oil Lease.*
   Where tenants in common or joint tenants of an oil lease or mine unite and co-operate in working it, they constitute a mining partnership.  (p. 72).

2. MINING PARTNERSHIP— *Control.*
   When members of a mining partnership cannot agree in management, those having a majority interest control its management in all things necessary and proper for its operation.  (p. 73).

3. MINING PARTNERSHIP—*Dissolution.*
   A sale of his interest by a member of a mining partnership to another member or a stranger does not dissolve the partnership, as in ordinary partnerships.  (p. 74).

4. MINING PARTNERSHIP—*Negligence of Partner.*
   If loss come to the firm by the culpable negligence or breach of duty or wrongful conduct, or diversion of the

social property from the firm's business to other business by one member, he is personally accountable therefor in an accounting between the members.  (p. 75).

5. MINING PARTNERSHIP—*Lien for Advancement.*
   Partners have a lien on a social property for advances or balance due them, after debts; but if they have divided the property or product of the business, giving each his share in severalty, and separating it from the balance, no such lien exists on the property or product so actually divided.  Such is the case with "division orders" in oil mining.  (p. 75).

6. MINING PARTNERSHIP—*Dissolution.*
   If a bill is filed by a member of a co-partnership for dissolution and account, and cause is shown for dissolution, there should be a decree of dissolution and full account, not one allowing the partnership to continue its business, and making only a partial account, and decreeing on its basis in favor of one against another member for a balance on such partial account, leaving assets untouched by the account.  (p. 78).

7. MINING PARTNERSHIP—*Dissolation Receiver.*
   When cause is shown for dissolution of a partnership, and the members are discordant and at ill will, and the partnership hopeless of prosperity, it should be dissolved, and a receiver and manager appointed, instead of leaving its assets and business wholly in the possession and control of one member, excluding the other.  (p. 78.)

8. MINING PARTNERSHIP—*Equitable Relief.*
   Equity, as a general rule, does not entertain a bill for account between partners unless a dissolution and winding up are asked, and cause therefor shown.  Then there should be dissolution and full final account.  (p. 78).

Appeal from circuit court, Tyler County.

Bill by J. M. Childers and another against S. H. Neely. Judgment for plaintiffs, and defendant appeals.

*Reversed.*

F. L. BLACKMARR, for appellant.

ROBERT McELDOWNEY and G. M. McCOY, for appellees.

BRANNON, JUDGE:

Childers and Ramey filed a bill in equity in the circuit court of Tyler against Neely, praying that a partnership between them be dissolved, an account taken "of all its accounts, dealings, and transactions whatever," and that a manager be appointed to take charge of the property. The business was oil production.  Neely admitted the joint

enterprise, but denied the partnership; and he joined in request for account, and did not resist a dissolution, if a partnership. The decrees made a partial account, decreed its balance against Neely, and denied him further participation, in the partnership and he appealed.

This case raises an interesting and important subject in this mining State; that is, whether, and when, joint tenants or tenants in common, jointly operating for oil, are partners, or merely co-owners. The bill asserts a partnership, while Neely denies it, asserting that it is a case, not of partnership, but co-ownership.

In two leases of town lots for oil and gas purposes, Childers owned one-fourth interest; Ramey, a three-eighth interest; Neely, a three-eighth interest. They were so far joint tenants. They agreed to develope the lots for oil, but made no written articles of partnership, in fact, no oral express formation of a partnership. They simply, by an indefinite understanding, agreed to develop their common property, each giving his skill, paying his share of outlay proportionate to his ownership, and getting his share of the product proportioned to such ownership. I use the word "product," instead of "profits," because there was no contract explicit in this point to distinguish product from profit. "Partnership must be distinguished from joint management of property owned in common. Where two partners own a chattel, and make a profit by the use of it, they are not partners without some special agreement which makes them so." T. Pars. Partn. § 76. Two heirs or other co-owners of a farm, jointly farming it for profit, are not partners. There is a peculiar partnership, called a "mining partnership," partaking partly of the nature of an ordinary trading or general partnership, on the one hand, and partly of a tenancy in common, on the other. It is an important question to those engaged in the oil and other mining business whether each one is jointly and severally liable for all the doings of every or any other of the associates in the venture, as in ordinary trading partnerships. What is a mining partnership? 15 Am. & Eng. Enc. Law, p. 609, says: "When tenants in common of a mine unite and co-operate in working it, they constitute a mining partnership." Many authorities there cited thus define it. See the California case of *Skillman* v.

*Lachman*, 83 Am. Dec. 96, and note discussing it fully; *Lamar's Ex'r* v. *Hale*, 79 Va. 147. Mere co-working makes them partners, without special contract. Barring. & A. Mines & M. Courts of equity take jurisdiction of them as if general partnerships. 2 Colly, Partn. chapter 35. Of course, owners of mines, oil leases or farms can by agreement make an ordinary partnership therein; but "where tenants in common of mines or oil leases or lands actually engage in working the same, and share, according to the interest of each, the profits and loss, the partnership relation subsists between them, though there is no express agreement between them to be partners or to share profits and loss." *Duryea* v. *Burt*, 28 Cal. 569. The presumption in such case would be that of a mining partnership, rather than an ordinary one, in absence of an express agreement forming an ordinary general partnership. Perhaps the case of *Bank* v. *Osborne*, 159 Pa. St. 10, 28 Atl. 163, and other cases in that state cited in Bryan, Petroleum & Natural Gas, 283, would justify the inference that the parties operated as tenants in common; but the current of authority elsewhere recognizes the inference of mining partnerships. That state does not recognize such a partnership. Justice Field said in *Kahn* v. *Smelting Co.*, 102 U. S. 645, 26 L. Ed. 266; "Mining partnerships, as distinct associations, with different rights and liabilities attaching to their members from those attaching to members of ordinary partnerships, exist in all mining communties. Indeed, without them successful mining would be attended with difficulties and embarrassments much greater that at present." One leading distinction between the mining partnership and the general one is that the general one has, as a material element of its membership, *a delectus personæ* (choice of person), while the other has not. Those forming an ordinary partnership select the persons to form it, always from fitness, worthiness of personal confidence; but we know such is not always or often the case in oil ventures. It is because of this *delectus personæ* that the law gives such wide authority of one member to bind another by contracts, by notes, and otherwise. One is the chosen agent of the other. Hence, when one member dies or is bankrupt, or sells his interest to a stranger, even to an associate, the partnership is closed,

one chosen member is gone, the union broken, because he may have been the chief dependence for success, and the newcomer may be an unacceptable person, who would entail failure upon the firm. In the mining partnership, those occurences make no dissolution, but the others go on; and, in case a stranger ·has bought the interest of a member, the stranger takes the place of him who sold his interest, and cannot be excluded. If death, insolvency, or sale were to close up vast mining enterprises, in which many persons and large interests participate, it would entail disastrous consequences. From the absence of this *delectus personæ* in mining companies flows another result, distinguishing them from the common partnership, and that is a more limited authority in the individual member to bind the others to pecuniary liability. He cannot borrow money or execute notes or accept bills of exchange binding the partnership or its members, unless it is shown that he had authority; nor can a general superintendent or manager. They can only bind the partnership for such things as are necessary in the transaction of the particular business, and are usual in such business. *Charles* v. *Eshleman,* 5 Colo. 107; *Skillman* v. *Lachman,* 83 Am. Dec. 96, and note; *McConnell* v. *Denver,* 35 Cal. 365; *Jones* v. *Clark,* 42 Cal. 181; *Manville* v. *Parks,* 7 Colo. 128, 2 Pac. 212; *Congdon* v. *Olds,* 18 Mont. 487, 46 Pac. 261; *Judge* v. *Braswell,* 13 Bush. 67; *Waldron* v. *Hughes,* 44 W. Va. 126, (29 S. E. 505). In fact, it is a rule that a nontrading partnership, as distinguished from a trading commercial firm, does not confer the same authority by implication on its members to bind the firm; as, e. g. a partnership to run a theatre or other single enterprise only. *Pcase* v. *Cole,* 53 Conn. 53, 22 Atl. 681; *Deardorf's Adm'r* v. *Thacher,* 78 Mo. 128; Smith, Merc. Law, 82; T. Par. Partn. § 85; *Pooley* v. *Whitmere,* 27 Am. Rep. 733. A mining partnership is a nontrading partnership, and its members are limited to expenditures necessary and usual in the particular business. Bates, Partn. § 329. Members of a mining partnership, holding the major portion of property, have power to do what may be necessary and proper for carrying on the business, and control the work, in case all cannot agree, provided the exercise of such power is necessary

and proper for carrying on the enterprise for the benefit of all concerned. *Dougherty* v. *Creary*, 89 Am. Dec. 116.

These principles settle much of this case. The demurrer was properly overruled, because there was a partnership, and equity only has jurisdiction to settle partnership accounts. 5 Am. & Eng. Dec. Eq. 74; 17 Am. & Eng. Enc. Law, 1273.

Neely excepted to the commissioner's report of settlement because of the allowance to Ramey of an expenditure advanced by Ramey of three hundred and sixty-nine dollars and seventy-five ' cents, as excessive, and because for repairs on two boilers without his consent. If the parties were mere joint tenants, consent would be necessary. *Ward* v. *Ward's Heirs*, 40 W. Va. 611, (21 S. E. 746), 29 L. R. A. 449. But, being partners, as above stated, a partner has power to order necessary repairs. Besides, Ramey owned a majority interest. The boilers were burnt badly, and it seems that this outlay, though large, is proven, and was necessary and usual in such a business, and, if unattended with other circumstances, would be clearly allowable under principles above stated. The commissioner reports that the injury to the boilers came from neglect of the pumpers; but much evidence tends to show that Ramey, without consent of Neely, removed the boilers off the ground owned by the firm, upon a lease of Ramey and Childers, in which Neely had no interest, and used them with another boiler in boring and operating wells thereon in connection with these wells of the firm, in Neely's absence, and put too much work upon them, with inadequate supply of water, which, likely, by heavy firing, caused the burning of the boilers. If this is so, how can Ramey expect pay for this outlay? Would so serious an injury have occurred to the boilers had this improper use of them not been made? We cannot say so with certainty, but it seems not likely. Ramey has no just claim, to be repaid expenditure for repairs caused by himself,—the diversion of the firm property to his own work, from the work of the firm. Losses from neglect of duty or bad faith of a partner, or breach of duty, or breach of a partnership agreement, or improper diversion of its property to purposes foreign to its business, will be charged to him, in accounting. 17 Am. & Eng. Enc. Law, 1217; 1 Coolly.

Partn. § 312; Story, Partn. § 169; T. Pars. Partn. § 151. Ramey does not deny such use.

The exception for the two hundred and thirty-nine dollars and seventy-five cents allowed Ramey for three-eighths of expense seems not well taken, and was properly overruled. The commissioner reports that Neely should be allowed nothing for such use of the boilers for business of Childers and Ramey outside the legitimate firm business, yet allows him one hundred dollars therefor. We are unable to say that such sum is not correct in amount, and will have to sustain the commissioner as to it.

Neely excepted because the commissioner reported that he was not entitled to any allowance on the claim made by Neely, that by reason of the use of the firm's boilers in boring and operating wells of Childers and Ramey on adjoining leases owned by them, in which Neely was not interested, the two wells of the firm, which had been bored before the others were, and were paying wells, were often shut down and unproductive, while those other wells were going on, and that by reason of want of water and steam, and the inadequacy of the engines to run all the wells, five or six in number, the production of the firm's wells was diminished. The commissioner says that Neely suffered no appreciable injury thereby. If injured at all, it was appreciable, and to be estimated. Ramey states, in short, that Neely was not entitled to a cent on this score. Neely's evidence is distinct that he was there numerous times, and found these two wells still. He swears to a large loss from this cause. He furnishes considerable evidence to sustain him in some loss from this score, and it seems that equity should make some compensation for it. There is evidence that Ramey, when asked why the wells were shut down, said that he had a larger interest in the other wells. Ramey (having bought out Childers' interest, and Neely being absent almost all the time of operation) had sole charge. The commissioner bases his opinion of no injury to Neely from pipeline reports, which are before us, but it does seem from the evidence that the firm business was neglected, and loss to it accrued therefrom to an appreciable extent, for which some compensation should be made. It is difficult to say what should be allowed on this account, it being a thing of only approximate estimate; and still it

seems an allowance should be made, as Ramey is claiming for outlay, and himself controlled the business.

When this suit was brought, Childers and Ramey obtained in it an injunction enjoining the pipeline companies transporting the firm's oil from paving Neely for his share of the oil to which he was entitled under his division orders, and enjoining Neely from any further participation in the partnership, and from selling his share of the oil; thus taking from him the wells and their proceeds, and leaving Ramey in sole charge of them. Neely complains that the court refused to dissolve this injunction. His counsel says there was no right to it, as the bill charged no insolvency. The bill, however, did charge that Neely had failed to contribute his part of the expense of the business, and that Ramey and Childers had made large outlays therefor, and that Neely had refused to make settlement, and was largely indebted to his associates from the transactions of the partnership. This justifies the injunction, if the oil of Neely were social assets, as partners, in advancing for expenditures for the partnership, have a lien on partnership property for advances. *Skillman* v. *Lachman*, 83 Am. Dec. 109; *Duryea* v. *Burt*, 28 Cal. 570; T. Pars. Partn. § 402, note. But this lien is only on partnership property while distinctly such; for it is the law that if there is a separation or division of the property, or part of it, there is no lien. If two partners consign goods for sale, and direct the consingee to carry the proceeds to the account of each, and it is done, neither partner has any lien on the share of the other in those proceeds, though it would have been otherwise if they had remained part of the common property. 2 Lindl. Partn. § 683; 1 Colly. Partn. § 108, note. Now, these partners agreed to have division orders when they began business (that is, the pipe lines to give each certificate of his share of the oil committed to them, which was a product of the wells); and this effected a separation of that product, making each one's share his several property, and severing it from the social property, if it was such at any moment. There being no lien, there was no justification for the injunction. It perhaps disabled Neely from paying as the bill demanded of him.

There is another error in the proceeding. The bill de-

manded a dissolution. It showed abundant cause, and the evidence shows abundant cause, of dissolution. The bill charges that the plaintiffs and Neely made a settlement to a certain date, but that they had been unable to get Neely to make a settlement since then; that he was violent and abusive, had threatened them with violence, and declared he would have nothing more to do with them; that he would not contribute to expenses; that bills remained un paid; and that because of the unsatisfactory condition of the business, and the "disagreements, dissentions, and disaffections between the partners, the property and business were suffering." The evidence shows these disagreements and dissensions. Thus, it was plain that the business was hopeless of success and prosperity, and the interests of all parties demanded absolute dissolution at the hands of the law. Reconciliation, harmony, and success were utterly beyond hope. 17 Am. & Eng. Enc. Law, 1104. Therefore the court should have decreed dissolution absolute, and directed an account of the partnership, and wound it up. But it decreed no dissolution, but, on the contrary, suffered the partnership still to subsist, and, indeed, go on in the sole hands and management of Ramey, excluding Neely therefrom, and decreed that the settlement by the commissioner should only apply to its date, leaving it open to future account. The decree perpetuated the injunction, forever prohibiting Neely from participation in the business, and provided that when he should pay four hundred and eighty-seven dollars and fifteen cents found due from him, and costs, the injunction should cease. That excellent, very late work, containing the leading late decisions in equity in America and England, the American and English Decisions in Equity, with elaborate notes collecting decisions (volume 5, p. 52), lays down the rule that equity can only entertain jurisdiction for an account when it can make a final decree in the suit; citing *Randolph's Adm'x* v. *Kinney*, 3 Rand. 394. That work (page 109) says., "As a general rule, a bill for accounting between partners which does not also seek a dissolution of the partnership will not be maintained;" citing cases,—among them, *Colville* v. *Gilman*, 13 W. Va. 314, in which Judge Green fully sustains this position. T. Pars. Partn. § 206; 2 Lindl. Partn. 948. If there ever were cases which, by

bill and proof, called for dissolution, and final account, not partial, this is one. And, besides the showing of bill and proof, a petition for rehearings alleged that Ramey had sold the boilers. The evidence so shows. This would charge Ramey to credit of Neely. There was partnership property in Ramey's hands. There could only one adequate relief be given,—dissolution, sale of the property entire, and full account. But no provisions was made for dissolution, sale, or full account,—only a partial settlement and decree against Neely for the sum found by it. The bill alleged that the property could not be divided in kind. If the injunction applied to property belonging to the firm, on which a lien rested for the other partners, it would be proper to continue it until final account and decree. *Robrecht* v. *Robrecht* 46 W. Va. 738, (34 S. E. 801). But Neely's share of the oil was his separate property. And I do not see why he should, without cause, be excluded from participation, letting Ramey have sole control. A receiver, impartial between them, was proper, under the circumstances. "If no dissolution is sought, a receiver and manager will not be appointed; but, with a view to a dissolution or winding up, a receiver and manager will be appointed, if there are any such grounds for appointment as are proper in other cases, or if the partners cannot agree to working the mines until sold." Colly. Partn. § 381. Therefore we dissolve the injunction, reverse the decree, overrule the demurrer to the bill, and remand for further proceedings as herein indicated, and further according to principles governing courts of equity in such cases.

*Reversed.*