## THOMPSON et al. v. CRYSTAL SPRINGS BANK.

Circuit Court of Appeals, Eighth Circuit.
August 26, 1927.

No. 7761.

1. Mines and minerals ⬳99(1)—Personal liability of members of mining partnership is not the same as in case of ordinary partnership.

In case of an ordinary mining partnership something more will be required to raise the presumption of liability arising from persons holding themselves out to the world as partners than would be necessary in the case of an ordinary partnership.

2. Mines and minerals ⬳97—Ordinary partnership with personal liability of partners may be formed to develop mine or oil leases.

That the object of an association of persons is the development of a mine or oil leases does not prevent them from forming an ordinary partnership as distinguished from a mining partnership, in which case the usual liability of the partners will follow.

3. Mines and minerals ⬳97—Evidence held to sustain finding that partnership for purchasing and reselling oil leases was ordinary commercial partnership and not mining partnership (Comp. St. Okl. 1921, §§ 8103, 8108, 8119).

Finding of jury that, a partnership formed for the purpose of purchasing oil leases and reselling them, the drilling of a test well being incidental to that purpose, was not a mining but an ordinary commercial partnership, under Comp. St. Okl. 1921, §§ 8103, 8108, 8119, held supported by the evidence.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

At Law. Action by the Crystal Springs Bank against R. R. Thompson and others. Judgment for plaintiff, and defendants bring error. Affirmed.

J. E. Curran, of Blackwell, Okl. (S. H. King and Bellatti & Brown, all of Blackwell, Okl., on the brief), for plaintiffs in error.

Frank Settle, of Tulsa, Okl., and Lester A. Maris, of Ponca City, Okl. (Hulette F. Aby and William F. Tucker, both of Tulsa, Okl., on the brief), for defendant in error.

Before KENYON, Circuit Judge, and MOLYNEAUX and JOHN B. SANBORN, District Judges.

KENYON, Circuit Judge. Parties will be designated as in the trial court. Plaintiff, Crystal Springs Bank, a Mississippi corporation, brought action against defendants on two promissory notes given August 2, and September 18, 1922, respectively, one for $5,000.00 and one for $1,000.00, signed, "Marshall Oil & Gas Company, by W. L. Marshall," claiming that defendants and Marshall constituted a partnership under said name, and that Marshall, with full authority from the defendants, borrowed money represented by the notes and used it in carrying on the business of the partnership, viz. dealing in oil leases. The parties involved as defendants are R. R. Thompson, C. F. Bays, L. D. Farmer, W. T. Rucker, H. B. Housch, and Robert Ballentine. The case was submitted to a jury and verdict returned for plaintiff as to both notes. Defendants' claim is that there was no intention on the part of the defendants to form a partnership of any kind, and that the evidence discloses that the original subscription made by the parties to Marshall was a mere "grubstake." Little was said during the trial as

to the proposition now strongly urged, that the arrangement constituted what is known as a mining partnership.

The facts in brief substantially are: W. L. Marshall interested the defendants, who were residents of Oklahoma, in a certain proposition with reference to oil and gas leases in Mississippi, held by what was known as the Latson Trust. Marshall had a contract with this company for the acquisition of their interest in such leases in Hinds and Copiah counties, Miss. One provision of this agreement in which Marshall was the second party is as follows:

"Party of the second part agrees to take over proposition as it stands, and to get leases perfected, and Latson Trustee straightened through the courts, so as to make all records clear, and titles merchantable, and to promote the proposition to a drilling contract for a test well, or a sale outright. Parties of the first part agree to make assignment to party of the second part as called for on any sale that he may make, party of the second part to furnish his own abstract, or certification of title."

Defendants with others entered into certain articles of agreement and subscribed $100 each to the enterprise. These articles contain the following provision:

"We, the undersigned subscribers, herewith pay each, the sum of one hundred ($100.00) dollars, the same to be for expenses in sending a representative to Mississippi to perfect the leases that are now held by the Latsen Trust, and now under contract to W. L. Marshall; it being understood that each $100.00 represents one-tenth interest in the Latsen Trust-Marshall Contract.

"Item: That, just so soon as this subscription is completed, then the subscribers thereto will meet, elect officers, and perform all other acts that shall be thereupon agreed to."

The contract between Marshall and the Latson Trust required Marshall to perfect the leases and make title merchantable and to promote the proposition to a drilling contract for a test well, or a sale outright. On December 15, 1921 defendants had a meeting at Blackwell, Okl. The minutes of that meeting are in evidence, a portion of which is as follows:

"At a meeting of the subscribers to take on the leases owned by the Latson Trust in Mississippi, the following were present: R. R. Thompson, W. L. Marshall, Robert Ballentine, R. C. King, H. B. Housch, and W. F. Rucker, absent, Mr. Farmer, Bays and Smith. Mr. Thompson was made chairman of the meeting and W. T. Rucker secretary. A motion was made and carried that the five members present on a committee to work with Mr. Marshall in disposing of the acreage, Mr. Thompson to act as secretary, and Housch as treasurer of the committee. After discussing the matter pretty thoroughly, the meeting adjourned.

"W. T. Rucker, Secy."

Marshall went to Mississippi to look after the proposition. Thompson, who was secretary of the committee, elected at the meeting referred to, and others of the defendants were in constant correspondence with Marshall relative to the general plans which he was undertaking to carry out. Marshall entered upon the drilling of a test well. Some misunderstanding with various people arising, his work was apparently delayed. He named the company "Marshall Oil & Gas Company" for the purpose of selling, as he testifies, acreage to a better advantage, and a large sign was placed upon a part of the property, designating it as the "Marshall Oil & Gas Company." Defendants Thompson and Housch went to Mississippi, visited the properties, and met the president of plaintiff bank whom they advised that they were pleased with what Marshall was doing, and that they were all, referring to the defendants, standing back of Marshall in what he did, and asked him to render Marshall assistance. July 28, 1922, a meeting was held at Blackwell, Okl., by those interested. The minutes of this meeting are in evidence. Defendants Farmer and Bays were not present at the meeting, but the other defendants were. It was termed a stockholders' meeting of the Marshall Oil & Gas Company. Five trustees were elected; three thereof being defendants Ballentine, Farmer, and Housch. Marshall and R. C. King, who does not appear to have been served with notice, were the other two. After the so-called stockholders' meeting, the trustees had a meeting at which defendant Ballentine was made chairman, King, secretary, Marshall, manager, and Housch treasurer. Shortly after this it became necessary to borrow money to carry on the drilling operations which Marshall had commenced. He made application to plaintiff for a loan of $5,000 to meet the pay roll, and wired defendant Thompson as follows:

"Crystal Springs, Miss. August 1st, 1922, Mr. R. R. Thompson, Blackwell, Oklahoma. Drill down one thousand feet first payment due and they want the money get

boys together and wire this bank to loan me five thousand for a few days feel sure will have it then found good showing of oil at nine ten great deal of interest shown have paid the three thousand draft."

Thompson, after consulting defendant Housch, wired in response thereto:

"Blackwell, Okla. 1:59 P. M. August 2, 1922.

"L. M. Dampeer, Banker Crystal Springs, Miss. We OK five thousand loan to Marshall.

"R. R. Thompson and Associates."

After the bank received this telegram, it loaned the money represented by the $5,000 note in suit. The $1,000 represented by the other note in suit was borrowed subsequently. All the money received from the bank was paid to the drilling contractor who was drilling the well under a contract. In addition to the $100 subscribed by each of the defendants to defray Marshall's expenses in going to Mississippi with relation to the Latson Trust leases, other sums not large in amount were thereafter advanced. The record is replete with correspondence between Marshall and defendants Thompson, Housch, Farmer, and Bays, concerning the undertaking.

The court submitted to the jury to determine as a question of fact whether a general partnership existed between the defendants and Marshall, or a mere grubstake agreement, and, if a general partnership, whether the drilling of the well was within the scope of the partnership. The alleged error in submitting the case to the jury on the theory of a general partnership was raised by exceptions to the instructions and objections to the admission of certain evidence, and is presented here under numerous assignments of error. No instructions were requested on the question of a mining partnership.

Of course, if the arrangement under consideration was what is commonly known as a "grubstake" agreement, there would be no liability on the part of these defendants on these notes, unless special authorization to Marshall to sign them was shown. 27 Cyc. p. 757; Prince et al. v. Lamb et al., 128 Cal. 120, 60 P. 689; Hartney v. Gosling et al., 10 Wyo. 346, 68 P. 1118, 98 Am. St. Rep. 1005; Gillespie v. Shufflin et al., 91 Okl. 72, 216 P. 132. The jury found against this theory advanced by defendants.

Plaintiff's amended petition uses the term "mining partnership" as applied to the arrangement, but it also alleges that a general partnership existed.

[1] For reasons born of the supposed necessity of mining development, some exceptions to the general law of partnerships seem to have grown up with relation to liabilities under and proof of mining partnerships. These partnerships generally result from the co-operation of tenants in common in developing leases. That a mining partnership is a peculiar one and differs in some respects from an ordinary commercial or trading partnership is well established by the authorities; the principal difference being that in a mining partnership the delectus personæ does not exist.

In the leading case of Skillman v. Lachman, 23 Cal. 204, 83 Am. Dec. 96, it is said:

"In the case of an ordinary mining partnership, something more will be required to raise the presumption of liability arising from persons holding themselves out to the world as partners than would be necessary in the case of an ordinary partnership. Such persons, in the absence of other circumstances, cannot fairly be presumed to have intended to render themselves liable to all the consequences of a commercial partnership."

In Kahn v. Central Smelting Co., 102 U. S. 641, 26 L. Ed. 266, the Supreme Court of the United States said:

"Mining partnerships as distinct associations, with different rights and liabilities attaching to their members from those attaching to members of ordinary trading partnerships, exist in all mining communities; indeed, without them successful mining would be attended with difficulties and embarrassments, much greater than at present."

From 1 Thornton's Law of Oil and Gas, § 355, we quote:

"But, in case of an ordinary mining partnership, something more will be required to raise the presumption of liability arising from persons holding themselves out to the world as partners than would be necessary in the case of an ordinary partnership."

See Childers et al. v. Neely, 47 W. Va. 70, 34 S. E. 828, 49 L. R. A. 468, 81 Am. St. Rep. 777; Congdon v. Olds et al., 18 Mont. 487, 46 P. 261; Peterson v. Beggs et al., 26 Cal. App. 760, 148 P. 541; Barrett v. Buchanan et al., 95 Okl. 262, 213 P. 734; Kennedy et al. v. Beets Oil Co., 105 Okl. 1, 231 P. 508; Huston et al. v. Cox et al., 103 Kan. 73, 172 P. 992; 27 Cyc. 759.

[2] It will not be seriously contended that owners of oil leases, as well as owners of mines, cannot enter into an ordinary partnership with reference thereto. Thornton's

Law of Oil and Gas, vol. 1, § 355, states the doctrine as follows:

"There may be a partnership in the working of a mine, subject to the rules relating to an ordinary partnership in trade. And this relation may be constituted either by express stipulation or by implication deducted from the acts of the parties."

And in Childers v. Neely, supra:

"Of course, owners of mines, oil leases, or farms can by agreement make an ordinary partnership therein."

There is little to be gained, however, in following the interesting question with relation to the law applicable to a strictly mining partnership as distinguished from an ordinary commercial or trading partnership, because, if the evidence here was sufficient to warrant a jury in finding a general partnership, that question is eliminated.

[3] The arrangement which these defendants and Marshall made does not seem to us, in the well-recognized sense of that term, to be a mining partnership at all. It was in the nature of an arrangement to deal in leases of oil lands, not to carry on oil operations. The drilling of the well which was undertaken in behalf of defendants and with their authorization was for the purpose of carrying out the general business incident to sales of the leases. It was to hold the leases and make them marketable. Marshall's business, as evidenced by the minutes of the meeting of December 15, 1921, was *to dispose of the acreage*. In the case of Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764, the language of the Supreme Court is instructive and quite applicable to this situation. Kimberly had advanced the money for Arms' expenses. Arms was to go into the mining fields of Arizona for the purpose of leasing, prospecting, and operating in mineral land, and was to perform the things belonging to the trade or business. The Supreme Court said:

"The partnership between Arms and Kimberly was not a mining partnership, in the proper sense of that term. It was not a partnership for developing and working mines, but for the purchase and sale of minerals and mining lands, and in that respect was subject to the rules governing ordinary trading or commercial partnerships. It can no more be called a mining partnership than a partnership for the purchase of the products of a farm and the lands upon which those products are raised, can be called a partnership to farm the lands." Snider et al. v. Davidson, 105 Kan. 661, 185 P. 724;

Rolshouse v. Wally et al., 263 Pa. 247, 106 A. 227.

We have considered the evidence very carefully, and it seems to us the case is peculiarly one for a jury. Cobb v. Martin et al., 32 Okl. 588, 123 P. 422; Flowers et al. v. Hill et al., 119 Okl. 275, 249 P. 704. It is clear that a court could not on this record say as a matter of law that the arrangement between defendants and Marshall constituted what is known as a mere mining partnership or a grubstake agreement. Certainly the defendants were engaged in something more than a mere grubstake enterprise. They were to share in the profits under a distinct agreement. With this goes the implication that they would share in the losses. They contributed to carry on the joint enterprise. Marshall, in contracting for the drilling of the well to assist in the sale of leases, was doing just what these defendants with the others interested were arranging for and wanted him to do. His acts with reference thereto were the acts of the defendants. These defendants with others interested were, prior to the borrowing of any money from plaintiff, holding meetings, electing so-called trustees, directing Marshall what to do, and cherishing with much enthusiasm the idea of acquiring wealth from the transactions in oil leases. The voluminous correspondence between certain of the defendants and Marshall shows that he was carrying on the work with the authorization and entire approval of the defendants. There was sufficient evidence in our judgment to warrant the jury in finding that at the time the notes in suit were given an ordinary general partnership under the name of "Marshall Oil & Gas Company" existed; that defendants were members of such partnership, and that the securing and use of the money represented by the notes was within the scope of the partnership business. Meehan v. Valentine, 145 U. S. 611, 12 S. Ct. 972, 36 L. Ed. 835; Le Roy, Bayard & Co. v. Johnson, 2 Pet. 186, 7 L. Ed. 391; Flowers et al. v. Hill et al., 119 Okl. 275, 249 P. 704; Comp. Okl. Stat. 1921, §§ 8103, 8108, 8119.

There being reasonable evidence to support the verdict of the jury, it should not be disturbed.

The tenth assignment of error raises a question as to the admission of alleged copies of the notes sued upon. The original notes were not produced at the trial. An attempt was made by secondary evidence to prove their existence. It is not suggested that the original notes for any reason were kept from the view of the jury, and, while the evidence

shows a carelessness in the handling of the notes, in view of the fact that there is no denial in the pleadings of their execution, and further that there is testimony that the copies are exact, it would seem overtechnical to reverse this case on the theory that the proof of search therefor was not ample to justify the introduction of the alleged copies of the notes. The evidence, while not entirely satisfactory, is sufficient we think to show that plaintiff's attorneys inadvertently lost or misplaced the original notes, although the record is somewhat lacking in showing that a very diligent search had been made therefor. In view of all the circumstances, we see no prejudice whatsoever to the defendants arising out of this alleged error.

The eleventh assignment of error relates to the testimony of witness Marshall concerning the object of the visit of defendants Thompson and Housch to Crystal Springs in July, 1922. The question eliciting the evidence was objected to on the ground that it called for a conclusion. The answer did not state a conclusion. Objection is now urged on other grounds, and the same, not having been presented to the trial court, will not be considered here.

Assignment of error 12 raises question as to the testimony of witness Dampeer concerning his reason for making the loan, viz. that he believed the defendants would stand back of Marshall, that defendants Thompson and Housch had told him defendants were backing Marshall, and that he believed defendants were financially responsible. It is sufficient answer to this assignment to say that no objection of any kind to the introduction of this evidence was made at the trial.

The thirteenth assignment of error is in relation to the admission in evidence of the telegram signed by defendant Thompson, directing the bank to make the $5,000 loan. This telegram was received in evidence without any objection, and hence there is no question with reference thereto for us to consider.

The fourteenth assignment of error is directed to an alleged error of the court in instructing the jury that defendant Thompson was bound by the telegram sent by him on August 2, 1922, and that the other defendants were bound if they authorized it, insisting that defendants would not be bound by the telegram unless at the time they had full knowledge thereof. The court instructed the jury that, unless defendants did authorize the telegram, they were not bound by it and not liable by reason of it. This is sufficiently clear and explicit.

The fifteenth assignment of error raises the question as to recovery upon the $1,000 note which was given some time subsequent to the execution of the $5,000 one; the contention being that the telegram of August 2, 1922, related only to the $5,000 loan. Of course this is true. It is not contended that the $1,000 note was taken by the plaintiff in pursuance of any authority given by the telegram of August 2d. The view we take and have indicated as to this case disposes of this question. If the general partnership existed at the time the notes were given, as found by the jury, the question of authority under the telegram is unimportant. It may be considered merely as evidence bearing on the questions involved.

It is suggested in certain assignments of error that the trial court was barren of jurisdiction because Marshall was a citizen of Mississippi, the same state as that of plaintiff's citizenship, and that defendant Falvey was not shown to be a citizen of any other state than Mississippi. Marshall was not a party to this case, nor is he shown by the record to be a citizen of Mississippi. Falvey, while named as a defendant in the amended petition, was not served with notice. The controversy presented was entirely between citizens of different states. The requisite diversity of citizenship to confer jurisdiction is apparent. Smith et al. v. Consumers' Cotton-Oil Co. et al. (C. C. A.) 86 F. 359; Delaware, L. & W. R. Co. v. Frank et al. (C. C.) 110 F. 689; Calder & Richmond v. E. W. Rosenthal & Co. (D. C.) 250 F. 507. These assignments have apparently been waived and abandoned by failure to argue them.

We are satisfied there were no prejudicial errors in this case, and the judgment is affirmed.