**DANA et al. v. SEARIGHT et al., and eight other cases.**

Nos. 222, 276–283.

Circuit Court of Appeals, Tenth Circuit.

Feb. 13, 1931.

J. W. Dana, of Kansas City, Mo., and Malcolm E. Rosser, of Muskogee, Okl., for appellants J. W. Dana and J. W. Dana Co.

R. W. Kellough, of Tulsa, Okl. (Charles G. Dailey, of Bluffton, Ind., Garland Keeling, Aby & Tucker, Frank Settle, and Randolph, Haver, Shirk & Bridges, all of Tulsa, Okl., and Dolman & Dyer and Ezra Dyer, all of Ardmore, Okl., on the brief), for other appellants.

H. A. Tallman, of Tulsa, Okl., for appellee F. J. Searight.

Before LEWIS and COTTERAL, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

F. J. Searight, a resident and citizen of the Eastern District of Oklahoma, and J. W. Dana, a resident and citizen of Missouri, started in to develop certain lands in said Eastern District on which they had oil and gas leases. Three wells drilled upon forty acres, known as the Youngblood tract, produced oil—two of them in large quantity—until salt water came in. The first well producing about two hundred barrels came in April 20, 1926, the second October 10, 1926, with a production of five thousand barrels per day.

The second big producer came in December 8, 1926, and these two produced for awhile seven thousand barrels per day. All other wells were dry.

Searight sued Dana et al. in February, 1927. He plead a joint adventure between himself and Dana to develop and mine the forty acres above referred to together with an adjoining eighty, known as the Epperson tract, for their oil and gas deposits. He alleged that he and Dana owned oil and gas leases on the one hundred and twenty acres in which he had an undivided three-fourths and Dana one-fourth that he had assigned to Dana in May, 1925; that with Dana's cooperation and assistance he drilled the wells, and that in addition to about $42,000.00 advanced or loaned to him by Dana he had paid out large sums for drilling wells on both tracts and operating the producers, one-fourth of which ($128,890.00) was chargeable to and should have been paid by Dana as his pro rata share of expenses. He prayed for an accounting, judgment for the amount found due him and a lien therefor on Dana's quarter interest in the property.

About three months later the Continental Supply Company, an Ohio corporation, sued Searight, Dana et al., alleging in its complaint that it had furnished material and supplies for drilling the wells on the one hundred and twenty acres; that it had filed under the state statute a material man's lien for material so furnished which had not been paid for; that Searight in his suit was seeking to obtain a partnership accounting against Dana and that his pleadings disclosed that the partners were in discord and disagreement among themselves and were seeking to secure their individual benefit and advantage at the expense of their creditors. Decree was sought declaring a lien on the property, that it be applied in discharge of the lien, and judgment was asked for deficiency, if any, against Dana and Searight. It was also prayed that the parties be enjoined from disposing of the property pending the litigation and that a receiver be appointed. By supplemental bills the Continental Supply Company brought into the case what was called the Mayes lease, being an oil and gas lease on another forty acres, it being alleged that Searight, Dana and one Lebow owned that lease; that some of the material and supplies purchased from the plaintiff had been moved from the Youngblood and Epperson tracts and were being used in drilling a well on the Mayes tract and it asked the court to extend the lien to that lease. It further ap-

peared that some of the oil produced and sold had not been paid for, about $45,000.00 in value being Dana's remaining share therein. Some of the defendants in that suit were also lien claimants. Other lien claimants and unsecured creditors intervened. They set up their claims by cross-petitions. Lebow went beyond the jurisdiction and did not return. Dana was served in Missouri with copy of a warning order pursuant to section 118, title 28 USCA Act March 3, 1875. He unsuccessfully moved to quash the service and dismiss the petitions. He also filed motions to quash substituted service on him on the cross-petitions in the Continental Supply Company case and they were overruled. He later filed answer in each suit.

He denied that he was at any time a partner of Searight in drilling the wells or producing oil; alleged that he was only a tenant in common, that he did not personally contract any of the indebtedness and that he and his interest in the property were not liable for said debts. He admitted that he had received approximately $188,000.00 from the proceeds of oil from the three producing wells on the Youngblood forty, alleged there was a balance due him in the hands of the defendant companies that had received the oil, and that Searight had received for his share of the oil in excess of $642,000.00.

It appears from the pleadings and proof that when Searight on May 16, 1925, assigned to Dana an undivided one-fourth interest in the leases on the Youngblood forty, the adjoining eighty and the Mayes forty, he and Dana entered into a written contract. In that contract Dana agreed to pay and did pay Searight $5,000.00 in consideration of the assignment to him of said interest in the leases on the Youngblood and Epperson tracts, an assignment of an undivided quarter interest in oil well drilling appliances, casing, etc., to be used in drilling a well on the Youngblood forty, and Searight agreed that he would drill said well to a depth of 4,000 feet unless oil should be found at a lesser depth, without further cost to Dana. Searight had drilled that well to a depth of about 1,000 feet when the contract was entered into. It was drilled to a depth of 4,000 feet and no oil or gas found. Searight went on however without further cost or charge to Dana and drilled it one hundred feet deeper and it became a producer making about two hundred barrels per day. Although the contract had been fully performed on both sides when that well reached a depth 4,000 feet, nevertheless, Dana thereafter received one-fourth of the proceeds from the oil produced therefrom, less royalties. Searight then proceeded to drill two other wells on the Youngblood forty, each of which came in as a large producer, and Dana thereafter received one-fourth of the proceeds of oil therefrom. These constituted the three producing wells. Searight and Dana had a like contract for a like consideration on the part of each for the drilling of a well on the Mayes forty, but the court appointed a receiver for all of the property, including funds for oil still in the hands of the pipe line company payable to Dana. The receiver took possession and the Mayes well was not put down.

Dana in his answers alleged that he had a special agreement with Searight for drilling the two wells that proved to be large producers, that he agreed to allow Searight credit for $10,000.00 for drilling each of said wells, the credits to be entered on the notes given him by Searight for the $42,000.00. He produced a letter to Searight in which he made that offer, but Searight's reply by letter six days later refused the offer, and he testified that he never made such arrangement.

The important issue of fact is whether the conduct of Searight and Dana in the development and operation of the property constituted them mining partners. The record is large and there is much proof bearing on the point. Dana contends there was no mining partnership between him and Searight, that he was not personally liable to Searight for expenses of development and operation or to the creditors, that he never advised Searight to sink any of the additional wells after the first one on the Youngblood forty, and that aside from agreeing to bear part of the expense of sinking the two large producers he opposed the sinking of the other wells, and that he never contracted any of the debts. Searight testified to the contrary, that he frequently counseled with Dana when they were in the field together and on the many trips he made to Kansas City to see Dana about the business. At one time when he consulted Dana about drilling a well, Dana said: "You are drilling the wells, you know your business, go ahead"; that he consulted constantly with Dana in the management and operation of the property, went over the property a great many times with him and made reports to him, and that he consulted with him about building two 55,000 barrel storage tanks that were to be placed on the Epperson eighty and about building a four inch pipe line, and it was agreed between them that he should carry the accounts and render Dana his propor-

tionate part of expenses and after the first well came in he sent Dana monthly statements of expenses incurred thereafter. On November 27, 1926, one and one-half months after the first large producing well came in, Dana wrote Searight that he had signed and was returning the contract with the Consolidated Pipe Line Company for the sale of 3,000 barrels per day and said:

"This looks like a good stroke of your trading ability. I hope this will render it unnecessary to build even the two 55,000 barrel storage tanks, in any event we should not contract for more than that at this time it seems to me. As we talked when you were here, I should hate to see us incur any indebtedness that would embarrass us with some little misfortune."

On October 25, 1926, which was fifteen days after the first big producer came in, Dana said this in a letter to Searight:

"Please keep me fully advised of conditions generally and especially of any additional development work you propose doing on the lease as of course I will be interested in expenses incurred from time to time. Would like to plan to get together often in conference on these matters."

Clearly Dana's relation to Searight from its inception was not that of an inactive, nonparticipating cotenant. He furnished funds and material that went into the drilling of the first Youngblood well and let Searight have $42,000.00 more for additional drilling. He made many trips to the field. His letters show that he was personally interested in keeping down expenses. The facts cause us to conclude that Searight, a driller and oil producer, was to have charge of operations in the field, and that Dana who possessed means and credit was to give financial assistance from the start, with the additional purpose on the part of both to counsel together as to their course as development progressed. The record shows that this general plan was followed until they met disaster. Less than three weeks before he came to terms with Searight and while they were negotiating, he said in a letter to Searight that if the terms he proposed should be accepted:

"* * * I would then shoulder my share of the responsibilities and liabilities of working out and financing the further development of the proposition; of course leaving you in full control of the actual business and operation of the properties, and following your lead when it comes to a question of sale and disposition of the properties if reasonable and fair.

"The only compensation outside of the speculative phase would be that my firm do the legal work for the enterprise, or if later incorporated, the Companies."

Their interests in the property and their conduct in relation thereto constituted a joint adventure, a mining partnership, within the rule laid down by the authorities. The quantum of proof is ample and convincing. In Sturm v. Ulrich, 10 F.(2d) 9, 12 (C. C. A. 8th Circuit), a case which came up from Oklahoma involving an oil lease, the court said this:

"The relationship between parties engaged in the common ownership and operation of mining property is somewhat sui generis. Where there is merely a common ownership and no joint development, the relation is, ordinarily, a tenancy in common. Where they join their efforts or means or property in the development of mining property they constitute a 'mining partnership.' The use of the term 'partnership' in this connection is by analogy and is not to be taken as meaning, in all legal respects, the same as an ordinary business or trading partnership. Such a partnership has many of the attributes and limitations of an ordinary partnership but not all such."

See, also, Loy v. Alston (C. C. A.) 172 F. 90; Gilbert v. Fontaine et al. (C. C. A.) 22 F.(2d) 657. Lindley on Mines (3d Ed.) vol. 3, § 797, announces the same rule. Also, Thornton's Law of Oil and Gas, § 355. Also an excerpt from Ruling Case Law to the same effect was quoted with approval in Young v. Krumme, 109 Okl. 145, 236 P. 606, and the further quotation therein from Manville v. Parks, 7 Colo. 128, 2 P. 212. See, also, on the same point, Kennedy v. Beets Oil Co., 105 Okl. 1, 231 P. 508; McKay v. Kelly, 130 Okl. 62, 264 P. 814.

The mining partnership being established the court below did not err in decreeing a lien in favor of Searight against Dana's interest in the partnership property for the balance found to be due Searight from Dana, constituting sums paid by Searight on partnership expenses that were chargeable to Dana. It was further said in Sturm v. Ulrich, supra:

"Where a mining partnership exists, each partner is liable to the others for his share (depending upon his interest) of the expenses and losses incurred in the enterprise and there is a lien for such upon his interest in

the property or proceeds therefrom in favor of creditors or of other partners who have made advances."

To the same effect, Lindley on Mines, supra, § 800; Thornton, Law of Oil and Gas, supra, § 366.

In the other suit the court found the indebtedness due the Continental Supply Company and to each of the other cross-petitioners, including general creditors, decreed them liens on the proceeds for which the property had been sold and was then being held by the receiver, and gave judgments against Searight for eleven-sixteenths and against Dana for four-sixteenths of the deficiency, if any, after applying said proceeds on the claims of creditors. Thus, it is seen, the liability of Searight and Dana was restricted to the same pro rata part of the deficiency, if any, as their pro rata share in the partnership property.

■ Both suits were brought, as we take it, under said section 118, title 28, USCA. They were local in character. Two questions arise in the second suit, whether the creditors, especially the general creditors, had "any legal or equitable lien upon" the property involved, as the statute requires; and secondly, whether the liability of Searight and Dana to creditors of the partnership is unlimited. On the first point the authorities above cited demonstrate that a mining partner not only has a lien for advances made by him on the interests of the other partners, but he also has a lien on the partnership property in favor of creditors. In strictness these are not liens but they are equitable rights which have come to be regarded as liens. The subject is learnedly discussed in Fitzpatrick v. Flannagan, 106 U. S. 648, 1 S. Ct. 369, 374, 27 L. Ed. 211, where it is said:

"His [a creditor's] right to appropriate the partnership property specifically to the payment of his debt, in equity, in preference to creditors of an individual partner, is derived through the other partner, whose original right it is to have the partnership assets applied to the payment of partnership obligations. And this equity of the creditor subsists as long as that of the partner, through which it is derived, remains; that is, so long as the partner himself 'retains an interest in the firm assets, as a partner, a court of equity will allow the creditors of the firm to avail themselves of his equity, and enforce through it the application of those assets primarily to payment of the debts due them, whenever the property comes under its administration.'"

Pomeroy's Equity Jurisprudence, § 1243, speaks of the "partner's lien" as an equitable lien, recognized and enforced by courts of equity.

■ Rowley on Modern Law of Partnership, § 526, and footnotes, is to the effect that creditors are subrogated to the rights of partners in having partnership assets applied in discharge of debts to partnership creditors. Rowley's comments are not directed exclusively to ordinary partnerships, and we see no reason why the principle should not apply as well to mining partnerships. Creditors of the two classes of debtors seem to have the same rights and remedies in this respect, under the authorities.

It fairly appears that the partnership became insolvent when the influx of salt water destroyed the producing wells; and within a short time thereafter the partnership ceased to function.

■ On the other question—extent of liability of mining partners, the authorities do not leave the answer in doubt. Especially important is the rule in Oklahoma where the property was situate and the transactions took place. In Robinson Petroleum Co. v. Black et al., 138 Okl. 128, 280 P. 593, 596, the Court said:

"In a mining partnership each party is liable for all work and material ordered by the other members of the partnership, which are reasonably necessary in the carrying out of the purposes for which the partnership exists. There is no contention in this case but what all material ordered was necessary for the purpose of developing the oil and gas lease in question, and each member of the partnership became personally liable, regardless of who ordered the material or employed the laborers."

The Supreme Court of California held each mining partner to unlimited liability to creditors. Stuart v. Adams, 89 Cal. 367, 26 P. 970. So also in West Virginia, Childers v. Neely, 47 W. Va. 70, 34 S. E. 828, 49 L. R. A. 468, 81 Am. St. Rep. 777, which was cited with approval by the Supreme Court of Oklahoma in Barrett v. Buchanan, 95 Okl. 262, 213 P. 734. The Supreme Court of Colorado in Higgins v. Armstrong, 9 Colo. 38, 10 P. 232, 237, said:

"So far as the powers of a partner to bind the firm in the usual course of the partnership business is concerned, it is held that the same principles apply in mining partnerships as in the case of ordinary partner-

ships. * * * In accordance with this principle, it was held in Manville v. Parks, et al., 7 Colo. 135, 2 P. 212, that where a member of a mining partnership purchased articles essential to the carrying on of the business, the debt being created in the necessary and usual course of the business, and within the scope of the partnership venture, the individual member who made the purchase had lawful authority to contract the debt, and to bind his copartners thereby."

Thornton's Law of Oil and Gas, § 366, says:

"In a mining partnership, a partner is liable the same as in an ordinary partnership—each partner is personally liable for the entire indebtedness of the firm."

█ It is claimed the court was without power to enter a personal judgment against Dana. These suits were local, brought in the district where all the property involved was situated under a statute specifying and limiting the relief obtainable. The defendant's property in such suit is proceeded against legally and it is lawfully taken when the statute is fully complied with. He has a right to process and its service as the statute provides, issued on a bill or complaint which complies with the statute. If he believes there are defects in these respects he may appear for that purpose and call them to the court's attention for correction. They may be jurisdictional, rendering any decree therein void or voidable, unless remedied in limine. In thus appearing he does not enter a general appearance subjecting himself to the court's power to render personal judgment. But where a defendant in challenging jurisdiction on the ground of invalid process or its service goes further and raises an issue on the merits of the cause stated in the bill he thereby voluntarily waives the defects, if any, and enters his general personal appearance. Simpkins Federal Practice, Rev. Ed. c. LXXXI; Foster's Federal Practice (6th Ed.) §§ 168, 169.

█ In his motion to quash service and dismiss Searight's bill Dana alleged as grounds therefor that the bill was not verified, that there was a misjoinder, a defect of parties plaintiff, and he prayed that the bill be dismissed. In his motion to quash the service in the Continental Supply Company Case he alleged that inasmuch as the bill prayed a deficiency judgment against him it was not a good bill under the statute to adjudicate and enforce a lien on his property, that such lien, if any, could not be extended to cover money payable to him by the pipe line companies, that a receiver had been wrongfully appointed and the property taken over by him in violation of the section under which the suits were brought, that the claimed lien could not be extended to Dana's interest in the Mayes lease, and that complainant had no lien by contract, the statutes of Oklahoma or otherwise, that complainant had unlawfully caused a receiver to be appointed and the property and assets of defendant to be taken by said receiver including certain moneys due and owing to defendant, and objected to the jurisdiction of the court over the subject matter of the suit in so far as it affected defendant's property and prayed that service be quashed. He also filed motions to quash like service issued on cross-petitions. The motions were overruled and Dana filed answers.

In his answer to Searight's bill Dana set up counterclaims and embodied therein a general demurrer. He plead indebtedness due him from Searight as affirmative relief. He answered the other bill and cross-petitions. He plead estoppel against all of the claimants and alleged: "That plaintiff's bill, and supplemental and all of said intervening bills and petitions, are wholly without equity and should be dismissed by this court," and that the receivership as to his undivided one-fourth interest should be lifted and discharged and the bills dismissed as to him. When the causes came on for final hearing the parties agreed that they be tried together, and that evidence offered on the part of either party to either of said suits should be considered in the other action so far as it was material. Dana voluntarily submitted himself to the power of the court to enter a personal judgment against him, and on the pleadings and proof it was its duty to do so.

█ J. W. Dana and Company, a corporation, and J. W. Dana, Trustee for said corporation, were made parties defendant in each of said suits and relief was granted against them in the decree. It conclusively appears from the record that the only interest J. W. Dana and Company ever had was as assignee of J. W. Dana, at one time, of the oil runs from the producing wells, to reimburse it for money it had advanced to J. W. Dana, as testified to by him, and that it had been fully paid and had no further interest in any of the property. It also conclusively appears that that company had had no transactions or agreements concerning the development or operation of the property. It is a family

44

corporation, all of its stock belongs to **J. W. Dana** and his children. So clearly the court erred in granting any relief against it or against J. W. Dana as its trustee. The court below will be instructed to eliminate that company and J. W. Dana in his capacity of trustee for it from the decree.

The other eight appeals are by the Continental Supply Company, intervenors and cross-petitioners in that suit. The only error severally assigned and relied upon by them is that the court limited the liability of Searight to eleven-sixteenths of the partnership debts and of Dana to four-sixteenths of said debts. This as already indicated was error, Searight and Dana each being liable personally for the full amounts due partnership creditors. The action of the court in those respects will be reversed with direction to correct the error. Dana's appeal in No. 222 will be dismissed as without merit. Appeals in Nos. 276–283 reversed and remanded. Each appellant will be adjudged to pay the costs incurred by him on appeal.